## WORLD'S COLUMBIAN EXPOSITION et al. v. UNITED STATES.

(Circuit Court of Appeals, Seventh Circuit. July 26, 1893.)

### No. 115.

1. APPEAL—JURISDICTION—CIRCUIT COURT OF APPEALS.

Where, in a suit for injunction, the power of the circuit court to determine the case is not denied, but it is contended by the defendant that the complainant has not made out a case properly cognizable in a court of equity, the jurisdiction of the circuit court is not in issue, within the meaning of the statute defining the jurisdiction of the United States circuit courts of appeals.

2. SAME—CONSTITUTIONALITY OF STATUTE.

Where the ground of the decision of the circuit court has no reference to the construction or application of the constitution or to the validity of any acts of congress, the jurisdiction of the circuit court of appeals to review such decision on appeal is not defeated by the fact that the constitutionality of certain acts of congress might have been challenged by the defeated party.

3. INJUNCTION—REMEDY AT LAW—WORLD'S COLUMBIAN EXPOSITION.

In a bill by the United States against the World's Columbian Exposition to restrain the latter, an Illinois corporation, from opening the exposition on Sundays, it was shown that congress had appropriated $2,500,-000 for the exposition on condition that the exposition should be closed on Sundays; that a large part of the appropriation had been paid, and that the corporation had opened the gates on Sundays; but it was not shown that the corporation was insolvent, or that the part of the appropriation paid might not be recovered by action at law. *Held*, that an injunction should not be granted, since there was no showing of irreparable injury or of inadequate remedy at law. 56 Fed. Rep. 630, reversed.

4. WORLD'S COLUMBIAN EXPOSITION—CHARITABLE TRUST.

Said appropriation, being made for the benefit of the local corporation, did not constitute a charitable trust, although in aiding the corporation a great public enterprise was aided. 56 Fed. Rep. 630, reversed.

5. SAME—CONSTRUCTION OF STATUTE—POSSESSION—AGENCY—CORPORATIONS.

Under the act of April 25, 1890, which gave governmental sanction to the exposition, but which declared that the United States should not in any manner or under any circumstances be liable for any acts of the local corporation, and left the exposition to be managed, the expenses borne, and the income received by the local corporation, the possession of the exposition grounds by the local corporation is not the possession of the United States, since the corporation is not the agent of the government.

Appeal from the Circuit Court of the United States for the Northern District of Illinois. Reversed.

Statement by FULLER, Circuit Justice:

This was a bill in equity, filed May 27, 1893, by the United States against the World's Columbian Exposition, a corporation organized and existing under and by virtue of the laws of the state of Illinois; H. N. Higinbotham, the president of that corporation; D. H. Burnham, director of works, and D. H. Burnham, lieutenant and chief officer of the Columbian Guards; Edmund Rice, commander of the Columbian Guards; George R. Davis, director general of the said World's Columbian Exposition, and Horace Tucker, superintendent of admissions,—alleging that on April 25, 1890, the congress of the United States had under consideration the propriety of holding at some place within the United States a celebration commemorative of the 400th anniversary of the discovery of America by Christopher Columbus, to be national and international in its character, and to be participated in by not only the people of the United States and the western continent, but by the nations of the civilized

world, and "that said celebration should be fostered, encouraged, and controlled by the United States, and to that end should be sanctioned by the United States in their sovereign capacity, acting through the congress of the United States." That various cities of the United States urged upon the congress the location therein of the celebration, and proposed to provide money for the erection of suitable buildings, and a suitable site or grounds therefor, which, upon completion, would be turned over to the United States, or to their lawfully, constituted representatives, "to have and hold for the uses and purposes aforesaid," and that among them the city of Chicago applied to the congress, and proposed to furnish the site and money for the buildings, and thereupon "to dedicate the same to the uses aforesaid, and deliver the possession and control thereof to the United States, or their lawfully constituted representatives, to be used for the purposes aforesaid."

Complainants further represented that the congress, in consideration of the premises, on April 25, 1890, passed a certain act, which was set forth in full; and it was averred that the commissioners provided for in the act were duly appointed and the commission duly organized, and that large sums of money were appropriated by the congress "for the purpose of establishing, supporting, and governing the said exposition, through the said commission, in the manner contemplated by the said act." The bill then set up the organization of the defendant corporation under the laws of Illinois, its tender of a site and plans and specifications for the buildings, and its providing ten million dollars for the work, the acceptance by the government of the site and the plans and specifications, and the proclamation of the president as to the time and place of holding the exposition, and inviting foreign nations to take part therein. That the defendant corporation erected the buildings for the purposes of the exposition, and the United States and foreign nations and the several states erected a large number of buildings for the accommodation of their respective exhibits. That afterwards, and on October 12, 1892, the commission provided for the dedication of the buildings, "and the said corporation then and there turned over to and delivered into the possession and control of the said commission, for the United States, the said site and the buildings thereon to be used by the said commission for the purposes of said exposition." That on August 5, 1892, "for the purpose of aiding in defraying the cost of completing the work of preparation for inaugurating the said exposition," congress passed an act (given in substance) providing for the coinage of and payment to the defendant corporation of 5,000,000 Columbian half dollars upon estimates of "vouchers for labor done, materials furnished, and services performed in prosecuting the work of preparing said exposition for opening," etc.; the acceptance by the corporation of "the appropriations provided for in said act;" the adoption of a rule or regulation by the corporation and the commission for keeping the gates closed on Sunday, which rule, it was charged, could not be changed or abrogated; the delivery to the corporation of 3,858,240 of the coins, in respect of which it was alleged by amendment that 600,000 were received by the defendant corporation March 20, and 500,240 April 20, 1893, "with full knowledge on the part of the said corporation at the time of receiving the same as above set forth of the passage of the act of congress of March 3, 1893."

It was further averred that the defendant corporation and the other defendants designed and intended to open the exposition and its gates on Sunday; that the board of directors had adopted a resolution to that effect; and that this would be done unless the defendants were restrained therefrom by order of court. The bill then proceeded:

"Your orators further aver that the said World's Columbian Exposition, corporation as aforesaid, and the said Harlow N. Higinbotham, D. H. Burnham, Col. Edmund Rice, George R. Davis, and Horace Tucker, are conspiring and confederating together, and are assuming to be in possession and control of the said exposition and grounds, and have usurped and are attempting to usurp an unlawful authority over the same, and assume to have the right to open and control the said gates and said grounds for the admission of the public thereto on the first day of the week, commonly called Sunday, during the continuance of the said exposition; and that, by reason of such unlawful claim and assumption, they claim an authority to open said gates and grounds to the

public on the first day of the week, commonly called Sunday, by virtue of the said resolution and rule so passed by the board of directors of the said corporation as aforesaid, notwithstanding the fact that the said unlawful assumption, and the attempt and purpose as aforesaid, to open the said grounds and exposition on Sunday, are in direct contravention of the terms of the said act of congress, and notwithstanding that the said contemplated acts in opening the said gates as aforesaid are and will be, as your orators aver, of great injury and a grievous prejudice to the common public good and to the welfare of the people of the United States."

In consideration whereof, complainants prayed that the defendants might be enjoined from carrying out the last-mentioned rule and regulation of the corporation in that regard, and from opening the exposition and the grounds and gates thereof on Sunday, and be commanded to close the exposition and grounds and gates on that day.

The defendant corporation answered, admitting its incorporation under the laws of Illinois, and the passing of the act of congress of April 25, 1890, and averred that the general assembly of the state of Illinois passed an act in relation to the World's Columbian Exposition, August 5, 1890, which, among other things, authorized the South Park Commissioners to allow the use of the park under their control for the purposes of said exposition upon such terms and conditions as might be agreed upon between the said park commissioners and the authorities having the management of said exposition; that on September 19, 1890, the South Park Commissioners passed an ordinance, (which was given in full,) granting to the defendant corporation the legal right to enter upon and occupy Jackson Park and Midway Plaisance for the purposes of the exposition under certain covenants and restrictions; that after the acceptance of said ordinance said defendant tendered to said World's Columbian Commission said Jackson Park and Midway Plaisance as a site for said exposition, which said site was duly accepted, and thereupon the said commission fixed and determined the plan and scope of the exposition, as was their duty and right to do, and the defendant thereafter submitted plans and specifications of certain buildings to be erected on said site, and at its expense, for the purpose of installing such articles as might be offered for exhibition; that the plans and specifications so submitted embraced only the buildings in which exhibits were to be installed, and did not include any other buildings whatever that have since been erected in Jackson Park and Midway Plaisance; that the defendant had constructed all the buildings in accordance with said plans and specifications, at an aggregate cost, including the preparation of the site, of about fifteen millions of dollars; that there were about six hundred and fifty acres of ground, included in Jackson Park and Midway Plaisance, about one hundred and fifty acres of which were occupied by the buildings called for by the plans and specifications hereinbefore referred to; that the balance of said Jackson Park and Midway Plaisance was substantially all occupied by buildings constructed by foreign governments, and by legally constituted authorities of the several states and territories of the United States, and by a large number of corporations and individuals, under leases, privileges, and grants from this defendant. Defendant, further answering, said that under the act of congress of April 25, 1890, it had full authority to make rules and regulations governing rates of entrances, admission fees, etc., without any restriction whatever as to the hours or days when said exposition should be open to the public; nor was there any restriction whatever imposed upon said defendant by the laws of the state of Illinois or by the ordinance of the South Park Commissioners relative thereto.

The answer further averred that prior to August 5, 1892, the defendant corporation had expended in the construction of the buildings about the sum of $8,000,000, and was liable on contracts for the construction of the same in the further sum of $2,000,000, amounting in the aggregate to $10,000,000, being the full amount required by the act of congress to be expended by the defendant in the construction of said buildings; and it was also averred that the plan and scope of the exposition by the terms of the act were within the exclusive jurisdiction of the World's Columbian Commission, and that the scope and plan adopted by the commission involved an expenditure of at least $5,000,000 in excess of the sum of $10,000,000 promised and pledged by

this defendant. That the defendant made proper report to congress of its expenditures and obligations thus made and assumed by the defendant, and that that report made proper request to congress that it should provide the necessary means for the completion of the buildings and the preparation of the exposition in accordance with the scope and plans of the commission. Thereupon congress passed the act of August 5, 1892, (set forth at large,) which was accepted by the defendant, and the defendant furnished the secretary of the treasury satisfactory evidence that it had expended the sum of $10,000,000, as required by the act of April, 1890, and also with a satisfactory guaranty that any further sum necessary to complete the work of the exposition for the opening thereof would be provided by the defendant; and submitted to the secretary of the treasury a statement of its assets and resources, which included as a part of the resources of the defendant said sum of $2,500,000 in souvenir coins, together with an estimated premium thereon of more than $1,000,000; and assured the secretary of the treasury that it would maintain and pay all the expenses, costs, and charges of the great departments organized for the conduct of the work of the exposition.

The answer further alleged that for the purpose of providing the necessary means for the completion of the work it increased the subscription to its capital stock $1,000,000, and executed its debenture bonds to the aggregate amount of $5,000,000, which bonds were made a first equitable lien upon the net receipts of the corporation accruing after May 1, 1893; and that by reason of the appropriation and the promise upon the part of the government to deliver to the defendant 5,000,000 of souvenir coins, as the same should be received from the mints, the defendant was enabled to negotiate and sell its debenture bonds, amounting to $5,000,000, which sum was covered into the treasury of the defendant, and that out of the proceeds of these bonds the sum of $2,500,000 in addition to the sum of $10,000,000 was expended in the construction of the buildings, and the receipted vouchers therefor were filed with the secretary of the treasury prior to the delivery of any of the coins, as required by the act of August 5, 1892.

Defendant also alleged that the secretary commenced transmitting to the defendant the souvenir half dollars. That 3,858,240 of them were delivered, and 1,141,760 were retained under an act of congress of March 3, 1893, as next thereinafter stated; and in answer to the amendment in respect to the receipt of 600,000 coins March 20, and 500,240 April 13, 1893, admitted the receipt thereof, but denied that the defendant had full knowledge of the passage of the act of congress of March 3, 1893, or any knowledge save and except such knowledge as might be derived from the publication of said act, and that the defendant, not being fully informed of the construction that would be put upon the act by the secretary of the treasury, either in the latter part of March or early in April, by its proper officer, communicated with the secretary of the treasury, requesting a construction of the act, and to be advised of the contemplated action of the secretary in pursuance thereof. That an answer to this communication and definite directions were not given until April 27, 1893, when the acting secretary of the treasury addressed to the corporation a letter of reply, which was received by due course of mail, and in which a copy of the opinion of the attorney general was inclosed, wherefrom it appeared that, in pursuance of the opinion of the latter, the secretary withheld and declined to deliver the sum of $570,880 in souvenir coins to the defendant.

The answer further averred that section 6 of the act of April 25, 1890, directs the national commission to appoint judges and examiners for the exposition to award premiums, and that said commission, for the purpose of executing the will of congress in this respect, appointed a committee on awards, with jurisdiction over all of said matters; that the estimated cost and expenses of said jury of awards was $570,880, and that thereupon said commission requested congress to make an appropriation for said amount, which was done by act of March 3, 1893; that after the passage of said act "the secretary of the treasury, claiming to act under authority of said law, has refused, and still refuses, to pay to this defendant the said sum of $570,880, and still withholds from said appropriation of two and one-half million of dollars said sum first mentioned, for the purpose of reimburs-

ing the government for its appropriations to meet the cost of said jury of awards."

The adoption of a new rule permitting the opening of the exposition and grounds on Sunday was admitted, and it was charged that by reason of the withholding of the sum of $570,880 by the secretary of the treasury the defendant was absolved and relieved from any obligations resulting from its acceptance of the act of August 5, 1892, and had the lawful right and power to adopt and enforce the rule last referred to. It was further said "that, if the true intent and meaning of congress, as expressed in said act of August 5, 1892, was to prohibit and restrain the public from their entrance upon and enjoyment of the grounds and appurtenances of Jackson Park and Midway. Plaisance not occupied by buildings erected for the purpose of installation of exhibits at said exposition, or of the entire exposition, on the first day of the week, commonly called Sunday, then the said defendant avers and charges that said act of congress is an unlawful restriction upon the rights and privileges of the public, is contrary to the laws and constitution of the state of Illinois, and repugnant to the constitution of the United States, and is, therefore, wholly void."

Defendant denied that it had delivered possession and control of the grounds selected as a site for the exposition to the United States, as charged in the bill, but, on the contrary, "charges the fact to be that the said complainant has never assumed the control of said exposition, but, on the contrary, has refused such control, and refused to become responsible for the cost of the preparation and the cost of administration of said exposition."

It was admitted that on the 12th of October, 1892, dedication ceremonies were provided for, but "the defendant denies that it then and there, or at any other time, delivered into the possession and control of the said commission of the United States the said site and the buildings thereof, to be used by the said commission for the purposes of said exposition, as charged in said bill of complaint."

Defendant admitted the passage of the rule providing for the closing of the exposition on Sunday, and charged that that rule was subsequently modified and changed by the board of directors, so as to provide for keeping the same open, and, as modified, was certified to the World's Columbian Commission, which refused to modify or amend the rule as so modified, which, as so modified, remained in full force and effect. The answer further averred that the defendant, in reporting, adopting, and certifying its rules to the World's Columbian Commission, reserved the right to change, alter, or amend the same, and that the right to so amend was conceded and adopted by said commission. The defendant admitted that it intended, and still intends, to open the exposition for the admission of the public on Sunday; but denied that the defendant was conspiring or confederating with others, and denied that it wrongfully assumed to be in possession and control of the exposition and the grounds; and denied that its purpose and intention to open the grounds and exposition on Sunday were in contravention of the terms of any act of congress, or that the opening of the exposition on Sunday would be "of great injury or grievous prejudice to the common public good and welfare of the people of the United States;" but, on the contrary, the defendant believed, and, so believing, charged the fact to be, that any action of the defendant and of the commission excluding the public from the exposition on Sunday or any other day of the week would be a great wrong and grievous injury to the public, and would thereby defeat in a great measure the purpose and object of the exposition.

The answer also set forth certain proceedings commenced against it in the state court on May 13th, and the order therein entered by that court on the 29th of May; and in conclusion the defendant prayed the same benefit as if it had demurred to the bill for want of equity. Certain exhibits and affidavits accompanied the bill and answer.

The other defendants answered, disclaiming any interest in the controversy.

The following is a sufficient resume of the matters appearing on the hearing:

April 9, 1890, upon an application made August 14, 1889, under an act of the general assembly of Illinois entitled "An act concerning corporations,"

and the acts amendatory thereof, the principal defendant was duly incorporated for the object of the "holding of an International Exposition or World's Fair in the city of Chicago and state of Illinois, to commemorate on its 400th anniversary the discovery of America," under the name of the "World's Columbian Exposition of 1892," subsequently changed to the "World's Columbian Exposition," with a capital stock of $5,000,000, afterwards increased to $10,000,000. On the 25th day of April, 1890, congress passed an act to provide for celebrating the 400th anniversary of the discovery of America by Christopher Columbus, (26 Stat. 62,) as follows:

"Whereas, it is fit and appropriate that the four hundredth anniversary of the discovery of America be commemorated by an exhibition of the resources of the United States of America, their development, and of the progress of civilization in the New World; and, whereas, such an exhibition should be of a national and international character, so that not only the people of our Union and this continent, but those of all nations as well, can participate, and should therefore have the sanction of the congress of the United States: Therefore, be it enacted by the senate and house of representatives of the United States of America in congress assembled, that an exhibition of arts, industries, manufactures, and products of the soil, mine, and sea shall be inaugurated in the year eighteen hundred and ninety-two, in the city of Chicago, in the state of Illinois, as hereinafter provided.

"Sec. 2. That a commission, to consist of two commissioners from each state and territory of the United States and from the District of Columbia, and eight commissioners at large, is hereby constituted, to be designated as the 'World's Columbian Commission.' "

The third and fourth sections related to the appointment of the commissioners and alternate commissioners, and the organization of the commission.

"Sec. 5. That said commission be empowered in its discretion to accept for the purposes of the World's Columbian Exposition such site as may be selected and offered and such plans and specifications of buildings to be erected for such purpose, at the expense of and tendered by the corporation organized under the laws of the state of Illinois, known as the 'World's Columbian Exposition of Eighteen Hundred and Ninety-Two:' provided, that said site so tendered and the buildings proposed to be erected thereon, shall be deemed by said commission adequate to the purposes of said exposition: and provided, that said commission shall be satisfied that the said corporation has an actual bona fide and valid subscription to its capital stock, which will secure the payment of at least five millions of dollars, of which not less than five hundred thousand dollars shall have been paid in, and that the further sum of five million dollars, making in all ten million dollars, will be provided by said corporation in ample time for its needful use during the prosecution of the work for the complete preparation for said exposition.

"Sec. 6. That the said commission shall allot space for exhibitors, prepare a classification of exhibits, determine the plan and scope of the exposition; and shall appoint all judges and examiners for the exposition, award all premiums, if any, and generally have charge of all intercourse with the exhibitors and the representatives of foreign nations. And said commission is authorized and required to appoint a board of lady managers of such number, and to perform such duties as may be prescribed by said commission. Said board may appoint one or more members of all committees authorized to award prizes for exhibits which may be produced in whole or in part by female labor.

"Sec. 7. That after the plans for said exposition shall be prepared by said corporation, and approved by said commission, the rules and regulations of said corporation governing rates for entrance and admission fees, or otherwise affecting the rights, privileges or interests of the exhibitors or of the public, shall be fixed or established by said corporation, subject, however, to such modification, if any, as may be imposed by a majority of said commissioners."

The eighth section related to a naval review in New York harbor.

"Sec. 9. That said commission shall provide for the dedication of the buildings of the World's Columbian Exposition in said city of Chicago on the twelfth day of October, eighteen hundred and ninety-two, with appropriate ceremonies; and said exposition shall be open to visitors not later than the

first day of May, eighteen hundred and ninety-three, and shall be closed at such time as the commission may determine, but not later than the thirtieth day of October thereafter.

"Sec. 10. That whenever the president of the United States shall be notified by the commission that provision has been made for grounds and buildings for the uses herein provided for, and there has also been filed with him by the said corporation known as 'The World's Exposition of Eighteen Hundred and Ninety-Two,' satisfactory proof that a sum not less than ten million dollars, to be used and expended for the purposes of the exposition herein authorized, has in fact been raised or provided for by subscription or other legally binding means, he shall be authorized, through the department of state, to make proclamation of the same, setting forth the time at which the exposition will open and close, and the place at which it will be held; and he shall communicate to the diplomatic representatives of foreign nations copies of the same, together with such regulations as may be adopted by the commission, for publication in their respective countries, and he shall, in behalf of the government and people, invite foreign nations to take part in the said exposition and appoint representatives thereto.

"Sec. 11. That all articles which shall be imported from foreign countries for the sole purpose of exhibition at said exposition, upon which there shall be a tariff or customs duty, shall be admitted free of payment of duty, customs fees, or charges under such regulations as the secretary of the treasury shall prescribe; but it shall be lawful at any time during the exhibition to sell for delivery at the close of the exposition any goods or property imported for and actually on exhibition in the exposition buildings or on its grounds, subject to such regulations for the security of the revenue and for the collection of the import duties as the secretary of the treasury shall prescribe: provided, that all such articles when sold or withdrawn for consumption in the United States shall be subject to the duty, if any, imposed upon such articles by the revenue laws in force at the date of importation, and all penalties prescribed by law shall be applied and enforced against such articles, and against the persons who may be guilty of any illegal sale or withdrawal."

The twelfth section appropriated $20,000 to be expended for purposes connected with the admission of foreign goods to the exposition. The thirteenth section made it the duty of the commission to make report from time to time to the president of the progress of the work, and in a final report present a full exhibit of the result. The fourteenth section provided that the commission should exist no longer than until January 1, 1898.

"Sec. 15. That the United States shall not in any manner, nor under any circumstances, be liable for any of the acts, doings, proceedings or representations of the said corporation organized under the laws of the state of Illinois, its officers, agents, servants or employes, or any of them; or for the service, salaries, labor, or wages of said officers. agents, servants, or employes, or any of them; or for any subscriptions to the capital stock, or for any certificates of stock, bonds, mortgages, or obligations of any kind issued by said corporation, or for any debts, liabilities, or expenses of any kind whatever attending such corporation or accruing by reason of the same."

Section 16 treated of the government exhibit, and created a board to have charge thereof.

Section 17 provided for the erection of a building for the government exhibit, and that the cost should not exceed the sum of four hundred thousand dollars, of which one hundred thousand dollars was then appropriated.

Section 18 appropriated two hundred thousand dollars for the purpose of paying the expenses of transportation, care, and custody, and the maintenance of the building or buildings, etc., and for the expenses of the commission created by the act, and concluded with this proviso: "Provided, that the United States shall not be liable, on account of the erection of buildings, expenses of the commission or any of its officers or employes, or on account of any expenses incident to or growing out of said exposition, for a sum exceeding in the aggregate one million five hundred thousand dollars."

Section 19 referred to the expenses for transportation and subsistence of the commission and the compensation of its officers.

"Sec. 20. That nothing in this act shall be so construed as to create any liability of the United States, direct or indirect, for any debt or obligation incurred, nor for any claim for aid or pecuniary assistance from congress or the treasury of the United States in support or liquidation of any debts or obligations created by said commission in excess of appropriations made by congress therefor.

"Sec. 21. That nothing in this act shall be so construed as to override or interfere with the laws of any state, and all contracts made in any state for the purposes of the exhibition shall be subject to the laws thereof.

"Sec. 22. That no member of said commission, whether an officer or otherwise, shall be personally liable for any debt or obligation which may be created or incurred by the said commission."

On August 5, 1890, the general assembly of the state of Illinois passed an act in relation to the "World's Columbian Exposition," (Laws 1890, 4,) which granted "to the authorities having the charge and management of said World's Columbian Exposition, for such term as may be necessary for the accomplishment of the objects thereof, the use and enjoyment of any public grounds or park grounds and rights appurtenant thereto, the title to or control over which may be vested in the city of Chicago, the corporate authorities of the city of Chicago consenting thereto, with the right and authority to improve the same for the purposes of the said World's Columbian Exposition in such manner as to the said authorities shall seem necessary and expedient," etc.

The third section of this act was as follows: "Sec. 3. In case the site or sites for the holding of the said World's Columbian Exposition, as finally located and fixed by the authorities in charge thereof, shall include the whole or any part of any public park which is, or may be, under the control and management of park commissioners, then and in that event it shall be competent, and express authority for that purpose is hereby granted to the park commissioners having the control and management of such public park to allow the use of the same or any part thereof, for the purposes of said World's Columbian Exposition, upon such terms and conditions as may be agreed upon between the said park commissioners and the authorities having the management of said exposition." The park commissioners were given power, upon a vote of the legal voters of the park district, to issue and sell interest-bearing bonds to an amount not exceeding five hundred thousand dollars, the proceeds to be used and applied in improving the grounds under their control if selected for the use of the exposition.

September 19, 1890, the South Park Commissioners passed and approved a certain ordinance "to allow the use of Jackson Park and the Midway Plaisance for the purposes of the World's Columbian Exposition," whereby permission and authority were given to the "World's Columbian Exposition, a corporation, to use Jackson Park and the Midway Plaisance for the purposes of the World's Columbian Exposition, upon the terms and conditions hereinafter set forth." This ordinance provided that the defendant corporation, after the acceptance of the ordinance and approval of the first bond to be given by that corporation, should "have the right to enter upon said premises, and take possession of such portions thereof as may be necessary in constructing the buildings and making other preparations for such exposition;" that the defendant corporation should have the right to inclose Jackson Park and the Midway Plaisance, or either of them, with a fence or wall, and to take all necessary measures to prevent encroachment of persons and vehicles upon such portions of the park and plaisance as might be in actual use. It was further provided that on the 1st day of October, 1892, "the South Park Commissioners shall turn over to the said corporation, the World's Columbian Exposition, the entire possession, control, and management of Jackson Park and the Midway Plaisance, and thereafter until the 1st day of January, 1894, the said corporation, the World's Columbian Exposition, shall have the full control of the same for the purposes of the said exposition, and shall make all rules and regulations in regard to the entrance to said premises."

The seventh section of this ordinance read thus: "Sec. 7. The use of said Jackson Park and Midway Plaisance is granted for the purposes of said ex-

position upon the further express condition, that the said park and plaisance shall be used during the periods above mentioned only for the purpose of said exposition and subject to the foregoing terms and conditions, and also upon the further condition that the said park and plaisance shall be surrendered to the South Park Commissioners in as good a condition as they now are. An acceptance of this ordinance by the World's Columbian Exposition shall constitute on its part an agreement to fully comply with all the terms and conditions of this ordinance."

The ordinance was duly accepted, and the first bond required given. Thereafter the site was tendered to the Columbian Commission, and accepted, and the commission fixed and determined the plan and scope of the exposition. On November 24, 1890, the plans and specifications of the grounds and buildings were adopted by the board of directors of the defendant corporation, and tendered to the commissioners of the World's Columbian Commission, in pursuance of the provisions of section 5 of the act of congress; and it was agreed that any changes, modifications, or extensions that might be found necessary should be made, with the approval of the board of conference and control of the commission and the committee of the directory on grounds and buildings. It appeared that the commission and the corporation in November, 1890, agreed upon a committee of conference to take conclusive action on matters of difference, and, on August 18, 1892, a council of administration, to exercise administrative jurisdiction for both bodies. July 31, 1890, by joint resolution of the 36th general assembly of Illinois, (Laws Extra Sess. 1890, p. 8,) an amendment to the constitution of the state of Illinois was proposed, adopted by a vote of the people November 4, 1890, and proclaimed November 29, 1890. Under this amendment the corporate authorities of the city of Chicago were authorized to issue interest-bearing bonds of the city to an amount not exceeding five millions of dollars, the proceeds thereof to be paid to the treasurer of the exposition company, to be used and disbursed by him under the direction and control of the directors in aid of the exposition to be held in the city of Chicago, in pursuance of an act of congress of the United States. It was provided that the corporate authorities should be repaid as large a proportionate amount of the aid given by them as should be repaid to the stockholders of the sums subscribed and paid by them, and that the money so received should be used in redemption of the bonds issued. Bonds were issued, and the money received by the defendant corporation accordingly. The scope and plans adopted by the commission made provision for fifteen great departments, and the defendant corporation proceeded to expend eight millions of dollars, and incur obligations to more than two millions of dollars in addition, and reported the facts to congress, and that it would require an expenditure of over five millions more to complete the undertaking in accordance with the scope and plan of the national commission.

On the 5th of August, 1892, (Stat. 1st Sess. 52d Cong. p. 389,) congress passed an act "to aid in carrying out" the act of April 25, 1890, which read:

"That for the purpose of aiding in defraying the cost of completing in a suitable manner the work of preparation for inaugurating the World's Columbian Exposition, authorized by the act of congress approved April twenty-fifth, Anno Domini eighteen hundred and ninety, to be held at the city of Chicago, in the state of Illinois, there shall be coined at the mints of the United States silver half dollars of the legal weight and fineness, not to exceed five million pieces, to be known as the Columbian half dollar, struck in commemoration of the World's Columbian Exposition, the devices and designs upon which shall be prescribed by the director of the mint, with the approval of the secretary of the treasury; and said silver coins shall be manufactured from uncurrent subsidiary silver coins now in the treasury, and all provisions of law relative to the coinage, legal tender quality, and redemption of the present subsidiary silver coins shall be applicable to the coins issued under this act, and when so recoined, there is hereby appropriated from the treasury the said five millions of souvenir half dollars, and the secretary of the treasury is authorized to pay the same to the World's Columbian Exposition, upon estimates and vouchers certified by the president of the World's Columbian Exposition, or in his absence or inability to act, by the vice president,

and by the director general of the World's Columbian Commission, or in his absence or inability to act, by the president thereof, and the secretary of the treasury, for labor done, materials furnished, and services performed in prosecuting said work of preparing said exposition for opening as provided by said act approved April twenty-fifth, eighteen hundred and ninety; and all such estimates and vouchers shall be made in duplicate, one to be filed with the secretary of the treasury, the other to be retained by the World's Columbian Exposition: provided, however, that before the secretary of the treasury shall pay to the World's Columbian Exposition any part of the said five million silver coins, satisfactory evidence shall be furnished him showing that the sum of at least ten million dollars has been collected and disbursed as required by said act: and provided, that the said World's Columbian Exposition shall furnish a satisfactory guaranty to the secretary of the treasury that any further sum actually necessary to complete the work of said exposition to the opening thereof has been or will be provided by said World's Columbian Exposition; but nothing herein shall be so construed as to delay or postpone the preparation of the souvenir coins hereinbefore provided for. And there is hereby appropriated, out of any moneys in the treasury not otherwise appropriated, the sum of fifty thousand dollars, or so much thereof as may be necessary, to reimburse the treasury for loss on the recoinage herein authorized.

"Sec. 2. That the appropriation provided in section one of this act shall be upon condition that the said World's Columbian Exposition maintain and pay all the expenses, costs, and charges of the great departments organized for the purpose of conducting the work of the exposition, said expenses, costs, and charges to be paid out of the funds of the said World's Columbian Exposition.

"Sec. 3. That fifty thousand bronze medals and the necessary dies therefor with appropriate devices, emblems, and inscriptions commemorative of said exposition celebrating the four hundredth anniversary of the discovery of America by Christopher Columbus, shall be prepared under the supervision of the secretary of the treasury at a cost not to exceed sixty thousand dollars, and the bureau of engraving and printing, under the supervision of the secretary of the treasury, shall prepare plates and make therefrom fifty thousand vellum impressions for diplomas at a cost not to exceed forty-three thousand dollars. Said medals and diplomas shall be delivered to the World's Columbian Commission, to be awarded to exhibitors in accordance with the provisions of said act of congress approved April twenty-fifth, eighteen hundred and ninety, and there is hereby appropriated from any moneys in the treasury not otherwise appropriated, the sum of one hundred and three thousand dollars, or so much thereof as may be necessary to pay the expenditures authorized by this section; and authority may be granted by the secretary of the treasury to the holder of the medal properly awarded to him, to have duplicates thereof made at any of the mints of the United States from gold, or silver, or bronze, at the expense of the person desiring the same.

"Sec. 4. That it is hereby declared that all appropriations herein made for, or pertaining to, the World's Columbian Exposition are made upon the condition that the said exposition shall not be opened to the public on the first day of the week, commonly called Sunday; and if the said appropriations be accepted by the corporation of the state of Illinois, known as the World's Columbian Exposition, upon that condition, it shall be, and it is hereby, made the duty of the World's Columbian Commission, created by the act of congress of April twenty-fifth, eighteen hundred and ninety, to make such rules or modification of the rules of said corporation as shall require the closing of the exposition on the said first day of the week commonly called Sunday.

"Sec. 5. That nothing contained in this act shall be construed to supersede or in any manner alter or impair the force or validity of the provisions of section fifteen of the act of congress approved Anno Domini April twenty-fifth, eighteen hundred and ninety."

On the same date an act making appropriation for sundry civil expenses of the government for the fiscal year ending June 30, 1893, was passed, appropriating $408,250 in and about the government exhibit; $230,000 for the

World's Columbian Commission, $110,000 thereof to be used by the board of lady managers; and providing "that the government exhibits at the World's Columbian Exposition shall not be open to the public on Sunday." The second section of this act was as follows: "Sec. 2. And it is hereby declared that all appropriations herein made for, or pertaining to, the World's Columbian Exposition are made upon the condition that the said exposition shall not be opened to the public on the first day of the week, commonly called Sunday; and if the said appropriations be accepted by the corporation of the state of Illinois, known as the World's Columbian Exposition, upon that condition, it shall be, and is hereby, made the duty of the World's Columbian Commission, created by act of congress of April twenty-fifth, eighteen hundred and ninety, to make such rules or modification of the rules of said corporation as shall require the closing of the exposition on the said first day of the week, commonly called Sunday."

October 25, 1892, rules were adopted by the corporation and the commission, and among them one providing that the gates should be open from May 1st, to October 30th, every day of the week except Sunday, when the gates should be closed. By another rule the board of directors of the defendant corporation reserved "the right to amend or add to these rules whenever it may be deemed necessary for the interest of the exposition."

The exposition was dedicated October 21, 1892, and the buildings tendered for its purposes. After the passage of the act of August 5, 1892, the defendant corporation issued five million dollars in debenture bonds, secured on the property and revenues of the exposition, and agreed to create no debt or obligation in excess of the same. Of this amount $3,700,000 were sold at once, and $1,300,000 placed in the hands of the director general, December 9, 1892, as security for the completion of the buildings; and it was alleged that these were subsequently disposed of. The defendant corporation expended more than sixteen millions in construction and preparation. The delivering of the souvenir coins was commenced December 27, 1892, and continued, from time to time, to April 13, 1893; and 3,858,240 coins were delivered,—600,000 of them March 20, and 500,240 April 13, 1893. January 26, 1893, the president of the United States transmitted to the congress the third regular report of the commission, and the report of the board of lady managers, with accompanying documents, among which was a report of the committee of awards of the commission, under date December 13, 1892, presenting an estimate of expenses for pay of judges, etc., of $570,880.94. On the 3d of March, 1893, congress passed an act making appropriations for sundry civil expenses for the fiscal year ending June 30, 1894, appropriating for the World's Columbian Commission $211,375, of which $93,190 was for the use of the board of lady managers, and $25,000 thereof made immediately available. The act continued in these words: "To enable said commission and the board of lady managers to give effect to and execute the provisions of section six of the act of congress approved April twenty-fifth, eighteen hundred and ninety, authorizing the World's Columbian Exposition, and appropriating money therefor, relating to committees, judges and examiners for the exposition, and the granting of awards, five hundred and seventy thousand eight hundred and eighty dollars, or so much thereof, as in the judgment of the lady managers may be necessary, of which sum twenty-five thousand dollars shall be immediately available: provided, that of this sum one hundred thousand dollars shall be devoted to the payment of judges, examiners, and members of committees to be appointed by the board of lady managers, as authorized by said section: and provided further, that said sum of five hundred and seventy thousand, eight hundred and eighty dollars shall be a charge against the World's Columbian Exposition, and that of the moneys appropriated for the benefit of the World's Columbian Exposition, amounting to two million, five hundred thousand dollars, under the act of August fifth, eighteen hundred and ninety-two; five hundred and seventy thousand, eight hundred and eighty dollars shall be retained by the secretary of the treasury until said World's Columbian Exposition shall have furnished to the satisfaction of the secretary of the treasury, full and adequate security for the return and repayment, by said World's Columbian Exposition to the treasury, of the sum of five hundred and seventy thousand, eight hundred and eighty

dollars, on or before October first, eighteen hundred and ninety-three; and until such security shall have been furnished by said World's Columbian Exposition, this appropriation, or any portion thereof, shall not be available."

On March 14, 1893, a letter was addressed by the president of the corporation to the secretary of the treasury, relative to the payments in Columbian half dollars, and a reply received under date of March 20th, stating "that such vouchers would be paid to the amount of $1,929,120, but not in excess of that sum, until the security required by the act of congress, approved March 3, 1893, was furnished." March 22d, at a regular meeting of the executive committee of the World's Columbian Exposition, this correspondence was referred to the committees on finance and legislation. On the 10th of April, 1893, the solicitor general of the United States gave an opinion, which was approved by the attorney general of the United States, advising the secretary of the treasury that it was his duty, under the law of March 3, 1893, to withhold from the defendant corporation the sum of $570,880, being a part of the appropriation made August 5, 1892, and on the 27th of April, the acting secretary of the treasury transmitted said opinion, and advised the corporation that in pursuance thereof the secretary would withhold that sum. April 27, 1893, a meeting of the executive committee of the corporation was held, and the report of the joint committees on finance and legislation relative to the withholding of $570,880 of the souvenir coins was presented, received, and approved. This report stated that by action taken by the board of directors on September 9, 1892, and December 9, 1892, the property and revenues of the corporation were pledged to holders of the debenture bonds, and that the bonds contained a binding agreement that the corporation should create no debt or obligation in excess of the sum of five millions of dollars, for which the bonds were authorized; that nearly all the bonds had been sold, and the amount realized into the treasury; that the committee regarded it as a direct and inexcusable violation of the pledges and covenants with the bondholders to enter into the undertaking required by the act of congress for the payment of the sum of $570,880; that the act of congress in requiring the secretary to retain 1,141,760 of the Columbian half dollars was a serious impairment of the resources of the corporation, and in violation of the conditions of the act of August 5th.

On the 12th of May, 1893, the board of directors resolved to open the grounds, but not the buildings, on Sunday, and on May 16th passed certain resolutions which recited that there was a widespread demand that not only the grounds, but the main buildings, of the exposition should be opened; and that the welfare of the public, and especially of the wage workers, would be promoted by permitting the people to enter the exposition on Sunday, and that a large majority of the people of this country demanded this privilege. Also that the withdrawal by congress by the act of March 3, 1893, of over one-fifth of the entire appropriation made in aid of the exposition had thereby removed all obligation on the part of the corporation to comply with the conditions of the act of August 5th. But, nevertheless, the corporation proposed to return the amount received; and it was resolved that both the buildings and grounds should be opened during the Sundays of the exposition period; that the operation of the machinery should be suspended as far as practicable, and all exhibitors and employes relieved from duty, except so far as essential to the protection of life and property; that there should be religious services and sacred music; and, further, "that in case the above is carried into effect this corporation pledges and obligates itself to return to the government of the United States that portion of the appropriation received by virtue of act of August 5, 1892, to wit, the sum of $1,929,120, from and out of the net receipts of this corporation, after the payment of all just and valid debts and obligations, before any payment shall be made to the stockholders or the city of Chicago;" and that the rules be amended so as to be consistent with and enable the execution of the provisions of the resolution.

The rule was thus amended, and on the 22d of May, 1893, at a session of the World's Columbian Commission, majority and minority reports were submitted from the judiciary committee upon the subject of the amended rule. The minority report reached the conclusion that section 4 of the act of August 5, 1892, was not operative to the extent of excluding the authority of both

bodies to deal with the question of Sunday opening, by reason of the provision of the act of March 3, 1893, and this report was substituted for the majority report by a vote of 30 to 27, and the commission thereupon, by a vote of 29 to 28, refused to modify the rule as amended.

The case came on to be heard before the circuit judges, with whom was associated the district judge for the northern district of Illinois, upon an application for a preliminary injunction, and on the 9th day of June an order was entered by the circuit court restraining the defendants from opening the exposition or the gates or grounds thereof to the public on the next and each ensuing Sunday during the continuance of the exposition, and commanding the defendants to close the exposition and the grounds and gates thereof to the public on that day until October 30, 1893, or until the further order of the court. Opinions were delivered by the circuit judges, and by the district judge, dissenting. See 56 Fed. Rep 630. From this order an appeal was prayed and allowed to the circuit court of appeals for the seventh circuit, but not made a supersedeas. The record having been filed on appeal on the 10th day of June, 1893, the circuit court of appeals, on application duly made in open court, directed the suspension of the order granted by the circuit court; and, as the circuit judges were disqualified from sitting on the hearing of the cause or question in the circuit court of appeals, designated the district judge for the western district of Wisconsin and the district judge for the southern district of Illinois (being the district judges oldest in commission of those competent) to sit therein with the circuit justice.

A motion to dismiss the appeal was made by the appellees, which motion and the appeal came on to be heard on the 15th day of June. On the 14th of June the corporation defendant below, appellant here, applied to the circuit court for leave to amend its answer, which was granted, and the answer amended by striking out the words, "and repugnant to the constitution of the United States," from the paragraph heretofore quoted. On the 17th of June the circuit court of appeals announced its decision, with a brief statement of the grounds upon which it rested, and gave judgment reversing the order of the circuit court and remanding the cause.

Walker & Eddy and J. W. St. Clair, for World's Columbian Exposition, appellant.

Thos. E. Milchrist, U. S. Atty., John P. Hand, J. L. High, and C. H. Aldrich, for appellees.

Before FULLER, Circuit Justice, and BUNN and ALLEN, District Judges.

FULLER, Circuit Justice, (after stating the facts.) Appellees have submitted a motion to dismiss the appeal upon the ground that the jurisdiction of the circuit court was in issue; that the case involved the construction or application of the constitution of the United States, and that the constitutionality of laws of the United States was drawn in question therein; that, therefore, the appeal from a final decree would lie to the supreme court of the United States, and not to this court; and hence that this appeal, which is from an interlocutory order, cannot be maintained under the seventh section of the judiciary act of March 3, 1891. We do not understand that the power of the circuit court to hear and determine the cause was denied, but that appellants contended that the United States had not, by their bill, made a case properly cognizable in a court of equity. The objection was the want of equity, and not the want of power. The jurisdiction of the circuit court was therefore not in issue within the intent and meaning of the act. So far as the construction or application of the constitution of the

United States and the constitutionality of the laws of the United States are concerned, we are of opinion that the case involved, or there was drawn in question, neither the one nor the other in the sense that the action of the circuit court was invoked to dispose of, or proceeded upon the disposition of, a contention raised as to either. The ground of the decision had no reference to the con-struction or application of the constitution, or the validity of the acts of congress in respect of that instrument, and the conclusions upon which the order was entered were unaffected by considerations of that character. Cases in which the construction or applica-tion of the constitution is involved, or the constitutionality of any law of the United States is drawn in question, are cases which present an issue upon such construction or application or consti-tutionality, the decision of which is controlling; otherwise every case arising under the laws of the United States might be said to involve the construction or application of the constitution, or the validity of such laws. The jurisdiction of this court to review the order cannot be defeated at the instance of appellees because the constitutionality of the acts upon which they rely might have been challenged by their adversaries. Railroad Co. v. Amato, 144 U. S. 465, 472, 12 Sup. Ct. Rep. 740; Snow v. U. S., 118 U. S. 346, 352, 6 Sup. Ct. Rep. 1059. The motion to dismiss is overruled.

The question to be determined is whether, upon this record, a preliminary injunction should have been granted. The bill avers that the defendants are usurping an unlawful authority over the ex-position and grounds, and in virtue thereof are assuming to open the gates on Sunday in contravention of the acts of congress, and notwithstanding such opening would be "of great injury and a griev-ous prejudice to the common public good and to the welfare of the people of the United States." It is not charged that any prop-erty interests of the complainants will be affected by the threat-ened action, nor is there any allegation of irreparable injury or probable loss by reason thereof. The office and jurisdiction of a court of equity, unless enlarged by express statute, are limited to the protection of rights of property. The court is conversant only with questions of property and the maintenance of civil rights, and exercises no jurisdiction in matters merely political, illegal, crim-inal, or immoral. In re Sawyer, 124 U. S. 200, 8 Sup. Ct. Rep. 482; Cope v. Association, 99 Ill. 489; Sparhawk v. Railway Co., 54 Pa. St. 401; High, Inj. § 20. But it is said that the interposition of the court may be rested upon the protection of the United States in their possession, use, and regulation of the grounds for the purposes of the exposition, upon the doctrine of charitable trusts, and upon the principles applicable to the restraint of negative covenants.

1. It is true that undertakings upon sufficient consideration not to do a given thing may, on occasion, be enforced by restraint of their violation; and where the covenant is express the element of ascertainable pecuniary damage or injury to the covenantee is not regarded as of essential importance. Coal Co. v. Schmisseur, 135 Ill. 371, 25 N. E. Rep. 795; Kirkpatrick v. Peshine, 24 N. J. Eq. 206; People v. Diedrich, 141 Ill. 665, 30 N. E. Rep. 1038; Leech v.

Schweder, 9 Ch. App. 465. But the application of this principle would require us to treat the transaction in respect of the appropriation of 1892 as purely matter of contract and of express covenant, and, moreover, in spite of its personal character, to hold that equity would specifically enforce, although compensation at law might furnish a full and satisfactory remedy. We cannot concur in this view. The furnishing of the five million souvenir coins was conditioned upon the defendant corporation providing and expending, in addition to the ten millions it had already contributed, the further sum of two and a half million dollars, and giving to the government a satisfactory guaranty that it would provide all additional sums necessary for completing the entire construction work prior to May 1, 1893, and was subject to two conditions subsequent, namely, the payment by the corporation of all the expenses, costs, and charges of the great departments of the exposition, and the closing of the exposition on Sunday. The corporation fulfilled the conditions precedent, provided and expended six million dollars, making sixteen millions, (not including the appropriation,) and completed the work. It is not argued that the opening of the exposition on Sunday would in itself inflict any pecuniary injury whatever, but, assuming such a breach of condition as entitled complainants to reclaim the money, the inadequacy of the remedy at law is nowhere made to appear. If the whole number of coins had been delivered prior to March 3, 1893, and the corporation had then opened the gates, but had tendered and brought them, or the proper amount, into court, a decree directing the gates to be closed on Sunday by way of specific performance could not be sustained; and, although such tender were not made, yet, if recovery could be had at law, and the judgment collected, that remedy would be adequate. Inability so to recover and collect is not asserted, nor any impediment surmountable only in equity suggested. The bill is not framed in the alternative, nor does it charge, nor is there anything in the evidence to indicate, that the corporation is insolvent. Whatever view may be taken of the provision that, if the appropriation be accepted on the condition, the commission shall make rules or modify the corporation's rules so as to require the closing of the exposition on Sunday, and of what was done and undone, or attempted to be undone, thereunder, the result is the same, and redress must be sought in the appropriate forum.

On this branch of the case it may be remarked that appellants insist that the government has wrongfully withheld one million, one hundred and forty-one thousand, seven hundred and sixty of the souvenir coins, and therefore does not come with clean hands, is itself in default, and has no standing in a court of equity to compel specific performance. Upon accepting the act of August 5, 1892, the corporation raised five million dollars on the pledge of its net gate receipts and the agreement that it would create no debt or obligation in excess of that sum. By the act of March 3, 1893, five hundred and seventy thousand, eight hundred and eighty dollars were appropriated to pay the costs and expenses of the jury of awards, and it was provided that this sum should be charged

against the corporation, and should be retained out of the souvenir coins, until the corporation furnished security for the repayment of the amount to the United States. Differing views are expressed as to the proper construction of this act, but the security required has not been given, and souvenir coins to the number named have been and are withheld. The corporation contends that it was not and is not liable to pay the expenses of the jury of awards, and that the withholding of the coins is unjustifiable; that, moreover, the new obligations it incurred on the strength of the delivery of the souvenir coins, and the vast additional expenditure to which it was put, render the position of the government wholly inequitable; that it should not have been required to give the security, and cannot give it, because of the terms of the five million loan; that it was discharged, under the circumstances, from compliance with the condition in question; and that, at all events, the government can only demand the return of so much of the appropriation as the corporation has received in preference to the original ten million, but in subordination to the rights of the bondholders; and this it claims it has offered to do, not by way of tender, but of doing equity. On the other hand, it is argued that the act of March 3, 1893, was not a breach of contract on the part of the United States; that the corporation was liable for the expenses of the awards and the withholding of the coins until security was given was justifiable; that, if the proper construction of the act is that upon refusal to give the security the coins were released, mandamus would lie to compel their delivery; that, if the corporation became subjected to additional burdens under the act of August 5, 1892, so that the act of March 3, 1893, operated to impair the obligation of the contract created by the former act, it would be invalid and the United States could not be held as in default by reason of an unlawful refusal by their officers to deliver the coins. And it is insisted that the acceptance of souvenir coins after the act of March 3, 1893, was passed estopped the corporation from questioning its validity and the continued existence and binding obligation of the contract. But the corporation replies that, treated as a contract, no equitable estoppel could arise upon the ambiguous language in which the act was couched until it was finally informed of the official construction and the conclusion thereupon to withhold the coins if the corporation refused to give the security; and that, in any view, the complainants, having brought about the embarrassments under which the corporation labored, were in no position to set up the alleged estoppel. We advert to these circumstances as illustrative of the difficulties attendant upon an attempt to rest the case on the rule often applied to negative covenants, but we do not deem it necessary to express any opinion in disposal of the questions thus raised, as the settled criterion for interference by injunction to prevent the violation of contracts is the inadequacy of the legal remedy, and, tested by that criterion, we regard the rule invoked as inapplicable.

2. Nor can we concur in the proposition that the appropriation of the $2,500,000 amounted to a charitable trust upon cer-

tain conditions, disregard of which would constitute a diversion warranting the intervention of a court of equity. The appropriation was made in terms for the purpose of aiding in defraying the cost of the completion of the work, and to be paid over on vouchers for labor done, material furnished, and services performed in the prosecution of that work. It was an appropriation for the benefit of the local corporation, to help it out of financial difficulty, and to enable it to complete its undertaking, and, as such, does not fall within the accepted definitions of charitable gifts for the benefit of an indefinite class of persons, and considered as public, and not private, benefactions. Indeed, the purpose for which the appropriation was specifically made had to be accomplished before the money could be paid over. Payments were to be made on estimates and vouchers properly certified, satisfactory evidence of the expenditure of ten million dollars, and a guaranty that all additional sums necessary to complete the work would be furnished. The government thus required absolute assurance not only that its money should go into the construction, but should not be wasted by failure to complete. Undoubtedly in aiding the corporation, a great public enterprise was aided; but that result was reached through the corporation for whose relief the money was exclusively bestowed, and into whose assets it passed for the ultimate benefit of its stockholders or creditors, as the case might be. The corporation, notwithstanding the lofty historical, educational, and instructive ends designed by its promoters to be subserved through its agency, was organized for pecuniary gain, and has invested sixteen millions of its own money in carrying out its object; and the mere fact that the United States were donors of these coins, and the money was the money of the public, cannot, under the terms of the act, impress the entire undertaking with the character of a charitable trust, to be administered and regulated by a court of equity.

3. This brings us to consider the position that the court might intervene, as prayed, to protect the United States in their possession, use, and regulation of the grounds for the purposes of the exposition. The argument is that the exposition is a national undertaking, and, as such, an enterprise of the United States; that the tender of the grounds and buildings and their acceptance amounted to a grant of them for a limited time for the purposes named; and that they are therefore in the exclusive possession and control of the United States in every respect. If the United States have the paramount authority and dominion involved in this proposition, it is not made clear why resort to a court of equity in aid of the exercise of such authority should be necessary; but, apart from that, we are unable, on the record before us, to concede the exclusive possession and dominion thus asserted, or that congress has proceeded upon any such assumption. Under the seventeenth clause of the eighth section of the first article of the constitution, the congress has power to exercise exclusive legislation "over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock yards, and other needful buildings." The government becomes the

owner for the purposes indicated, and all state authority and jurisdiction over places so acquired may be extinguished; and, indeed, jurisdiction may be transferred where the property is not acquired in accordance with that clause. Benson v. U. S., 146 U. S. 325, 13 Sup. Ct. Rep. 60. But no such state of case exists here. The United States have not acquired these grounds, and there has been no cession of jurisdiction. Offenses in that locality are punishable under state authority, and the police power of the state is in no respect curtailed. It is admitted that the physical possession is in the local corporation, while it is insisted that it is held for the United States; that congress has the right to direct the gates to be closed on any day of the week, and has given such direction in the appropriation acts of 1892. But in that legislation congress did not affect to be acting in the exercise of the police power, or as a matter of administrative detail, upon the theory of that absolute control which it has over the seat of government and other places within its exclusive jurisdiction. It sought to attain the fulfillment of its wishes in this particular through the condition attached to the appropriations, and the direction to the commission in respect of the rules. The provision of the sundry civil act in that regard related to appropriations for the government exhibit and commission, and, as respects the local corporation, added nothing to the force of the souvenir coin act, unless we are to hold that the government exhibit and boards occupy such a relation to the corporation that appropriations to them are appropriations to it. Confessedly, unless the alleged exclusive possession and dominion existed in law from the first, the contention fails. The preamble of the act of April 25, 1890, recited that the contemplated exposition should be of a national and international character, and should therefore have the sanction of the congress of the United States. This sanction the act gave, but it was carefully framed to protect the government against any and all liability for the cost of construction, control, and administration of the exposition. The national commission for which it provided was empowered to accept the site and plans and specifications for buildings to be erected at the expense of the local corporation, and tendered by it, if deemed adequate, and if the commission were also satisfied that the corporation would provide ten million dollars in ample time for use in construction and preparation as the work progressed. In these particulars the commission was to see to it that the exposition did not fall below what it should be in view of its comprehensive character and the countenance extended to it by congress. Similarly the commission was to determine the plan and scope of the exposition, allot space for and classify the exhibits, appoint judges and award premiums, and have charge of all intercourse with the exhibitors and the representatives of foreign nations. But the corporation, which was to provide the grounds and buildings, and upon which the burden of the general expense was to fall, was to take charge of the grounds and buildings so provided, and regulate the rights of the public therein and to admission thereto, and through such control to obtain the return of its enormous ad-

vances. It possessed all the powers of like corporations under the laws of Illinois necessary to effectuate the purpose for which it was organized, the holding of an international exposition or world's fair; that is to say, it derived from the state express power to provide, conduct, and manage the exposition, and all the powers incidental thereto. These powers necessarily included the power to make rules and regulations, and this was recognized by section 7 of the act of April 25, 1890, with, however, the reservation of the right to modify. The power to make carried the power to amend; and, indeed, the rules as adopted specifically so provided.

It is claimed that changed circumstances justified a change of regulation as to closing, and that the new rule has not been modified; but, after all, unless the government possessed the exclusive power to control, regulate, and manage the grounds and buildings, the case would still stand upon the alleged violation of a condition, and the consequences flowing therefrom. If the status quo were restored, or capable of restoration, through remedy at law, the bill cannot be sustained. Neither the commission nor the corporation could impose liability upon the United States. The fifteenth section provided "that the United States shall not in any manner, nor under any circumstances, be liable for any of the acts, doings, proceedings, or representations of said corporation organized under the laws of the state of Illinois," or for any of its debts, liabilities, or expenses of any kind; and section 20, "that nothing in this act shall be so construed as to create any liability of the United States, direct or indirect, for any debt or obligation incurred or created by said commission in excess of appropriations made by congress therefor." Suitable buildings for governmental exhibits were provided and appropriated for, and a board created to prepare and take charge of such exhibits, and provision was made for the expenses of that board and of the commissioners, but no control was asserted over the construction, preparation, and administration of the exposition, and no appropriation made in aid thereof. And while the appropriation of August 5, 1892, was made to assist in defraying the cost of completing the work of preparation, the act in terms reaffirmed the provisions of section 15. In short, the government did not intend to permit any inference of liability beyond what was specifically expressed; nor, by asserting absolute control over the enterprise, to put itself in an attitude which might justify such an implication. The congressional legislation recognized the exercise by the corporation of its appropriate powers, and left to it the matters of construction and of administration to the extent referred to. The exposition was to be managed, the expenses borne, and the income received, by the corporation, and accordingly it has directed and controlled all the physical agencies employed in the work of preparation and administration. The corporation selected, with the concurrence of the national commission, Jackson Park as a proper site for the location of the necessary buildings for the exposition. The South Park Commissioners are a corporation created upon a vote of the legal voters of the South Park district to hold, manage, and control certain lands, of which Jackson Park and the

Midway Plaisance constitute a part, "as a public park, for the recreation, health, and benefit of the public, and free to all persons forever."

By act of the general assembly approved August 5, 1890, the South Park corporation was empowered to allow the use of the park, or any part thereof, for the purposes of the exposition, on such terms and conditions as might be agreed upon, and thereupon the South Park Commissioners passed the ordinance giving permission and authority to the Illinois corporation to use Jackson Park and the Midway Plaisance for those purposes. No question is raised as to the competency of the general assembly to allow this to be done, and it is admitted that by a majority vote of the legal voters of the park district bonds were authorized to be issued by the park commissioners as provided for by the act. The ordinance fixed the terms and conditions of occupancy, and was accepted and bond given by the corporation as required. The contract thus made was with the local corporation, and in virtue thereof the corporation entered into possession, which possession it still retains; and it has never assigned or transferred, or attempted to assign or transfer, to the United States or any other party. Title and physical possession were thus both in the corporation for the purposes of the exposition, and to be held in due accordance with the provisions of the original act of congress in that behalf. The act did not require the closing of the gates on any particular day, and no interference by the corporation with the control of the United States over their own buildings and exhibits, the action of the commission and the boards of lady managers and of management and control of the government exhibits, or of the officers of the revenue, is complained of. The situation demanded the harmonious cooperation of the United States, through their agencies, and the corporation, but did not involve the absolute dominion of the one over the other as claimed.

We think, furthermore, the position that the exposition was exclusively an undertaking of the United States, and the corporation a mere agent, is shown to be untenable by the consequence contended to be deducible therefrom that therefore the corporation, while responsible to the state of Illinois for the proper exercise of its franchises, and to its creditors and stockholders for the proper administration of its affairs and property, might be subjected to obligations which it never incurred, and to indebtedness which it never created, and its ability to discharge its legitimate functions and respond for its legitimate liabilities might be at any moment utterly destroyed. We find no warrant in the documents before us for holding that the corporation occupied any relation involving such results. The original amount of expenditure was defined, and the assumption to pay and the payment of the further amounts rendered necessary by the expansion of the scope of the affair constituted, under the circumstances, no recognition of the right to impose obligation compulsorily and without consent. We perceive no reason for attributing to congress, while disclaiming any responsibility whatever for the acts and doings of the corporation, or lia-

bility for its obligations of any kind, or any liability for its own designated agents beyond specified amounts, the intention that those agents, or either of them, might contract indebtedness independently of the corporation, which the latter would be compelled to pay.

In the Philadelphia case the exposition was managed by two bodies organized by authority of congress, yet their rights and property were not regarded as in any legal sense the rights and property of the United States. The supreme court held them to be merely organizations through which the people might carry out an enterprise of their own, which was national, in that it had the sanction of the government, but was not therefore a governmental enterprise. Eyster v. Board, 94 U. S. 500. The supreme court said, speaking through Mr. Chief Justice Waite, that it was very apparent that the object of congress in all its legislation with reference to the Centennial Exhibition was to enable the people of the United States to commemorate "the completion of the first century of their national existence" by an exhibition "in which the people of the whole country should participate," and which should have the sanction of the government, and that in that sense the object was national; but that it was equally clear that until the act of 1876 it was expected that the entire expense would be borne by the people without assistance from congress. And as to the appropriation of 1876 it was held, under the terms of the act, that after payment of debts the amount had to be returned before any distribution to stockholders,—a result reached by construing the word "profits," as used, to be equivalent to "net receipts." In that case, as in this, congress, out of abundant caution, lest the enterprise might be regarded as governmental, and, if so, some question might be raised as to the operation of state laws, provided that nothing in the act of congress should be construed so as to override or interfere with such laws or contracts made thereunder; but this was as a measure of precaution, and not by way of a necessary reservation of state jurisdiction, which had not been ceded, and could not be held as surrendered by implication.

Something might well enough be added as to the bearing in a court of equity of this late assertion of absolute dominion after the corporation had so long managed and controlled the exposition and expended sixteen millions of dollars in the effort to complete the work in a manner commensurate with the magnitude of its design and the honor of the nation, the state, and the municipality, whose interests as well as the interests of all peoples were to be subserved by its success; but we forbear further observations upon this topic. We are of opinion that the disposition of the case, whether tested by the bill, or, irrespective of any technical adherence to its averments, by the facts shown, must turn upon the legislation of 1892, our views in regard to which have already been sufficiently indicated.

We have given to this record patient investigation, and to the able arguments of counsel the attention which their merits deserved and the character of the controversy demanded, and we can·dis-

cover no tenable ground excepting the case from the ordinary rule which requires, in order to the exercise of jurisdiction in chancery, some injury to property, whether actual or prospective; some invasion of property or civil rights; some injury, irreparable in its nature, and which cannot be redressed at law. The application of that rule is fatal to the maintenance of the order under review; and whatever temptation to leave the beaten path the record of a particular cause may be supposed to afford, it is not for courts of justice, in the exercise of an unregulated discretion, to remove the settled landmarks of the law.

The order is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.