### CARR v. GORDON et al.

(Circuit Court, N. D. Illinois. September 15, 1897.)

1. REMOVAL FROM OFFICE—CIVIL SERVICE ACT.

22 Stat. c. 27, providing for the creation of a civil service commission, and for a system of classification of federal officers, competitive examinations, and appointments from eligible lists, and prohibiting various acts in derogation of the purpose of the statute, was intended to provide, for such branches of the civil service as should be included within its provisions, a thoroughly competent body of men, selected solely for competency and fitness, and to protect them against accountability to any political party, and to prevent their discharge, promotion, degradation, or other change in official rank or compensation for giving, withholding, or neglecting to make political contributions in money or other valuable thing; but it did not deprive the appointing power of any previously existing right to remove, promote, or change in rank or compensation for other reasons.

2. SAME—RULES OF NOVEMBER 2, 1896.

The rules promulgated by the president on November 2, 1896, providing for certain classifications and exemptions, and regulating promotions in the service, do not regulate removals from office, except for political or religious opinions or affiliations.

3. SAME—ORDER OF JULY 27, 1897.

The order promulgated by the president on July 27, 1897, providing that "no removal shall be made from any position subject to competitive examination except for just cause, and upon written charges filed with the head of the department or other appointing officer, and of which the accused shall have full notice, and an opportunity to make defense," constitutes an authoritative expression by the executive of the United States of his desire and command to his subordinates with respect to removal from office of those coming within the scope of the civil service regulations. It is an administrative order of the executive, adopted by him in the exercise of his existing right to regulate for himself, in respect to removals, the conduct of those who are subject to his authority. He who disobeys such an order is responsible to the president, and must be dealt with by him, and the president may rescind it at his pleasure.

4. SAME—NOT ENFORCEABLE IN EQUITY.

That order, however, does not emanate from the lawmaking power, is not made in compliance with any law nor in regulation of the execution of any law enacted by congress restricting the right of removal, and is not the law of the land. It confers upon the incumbent of an office within the classified service no vested right to hold office indefinitely, and no right of which a court of equity can take cognizance.

5. SAME.

The regulations and orders of the executive or heads of departments under authority granted by congress are regulations prescribed by law in the sense that acts done under them are upheld, and in that light they may have the force of law. But the failure to do the act thereby enjoined, or the doing of the act thereby prohibited, does not render one liable to the law.

6. POWER OF CONGRESS TO REGULATE REMOVALS.

Quære, whether congress has the constitutional right to restrict the president's power of removal.

In Equity.

The complainant filed his bill against the defendant Charles U. Gordon, as postmaster of the city of Chicago, and John M. Hubbard, as assistant postmaster, and charges: That in the year 1893 he was appointed postmaster at Englewood, a post office then existing in the county of Cook, state of Illinois. That he duly served as such postmaster until July 1, 1894, when, by order of the postmaster general, that office was discontinued, and became a part of the post office of the city of Chicago, and was then designated as "Station O" of the Chicago city post office. That thereupon he was by the then postmaster of the city of Chicago appointed superintendent of Station O, and duly qualified, and has since continued, and now continues, in that position, and to fulfill its duties. That such office is one subject to competitive examination, and governed and controlled by the civil service act of the United States approved January 16, 1883 (22 Stat. c. 27, p. 403). That September 3, 1897, the defendant Gordon addressed to him the following letter:

"Post Office, Chicago, Ills., Executive Division, September 3, 1897.

"C. W. Carr, Esq., Superintendent Station O, Chicago, Ills.—Dear Sir: It has been decided to transfer Superintendent Vreeland to Station O, to fill the place now occupied by you, on and after September 6, 1897. Auditor Matter has been instructed to make the necessary transfer on the books, Monday, the 5th. On completion of this, you will report for duty to the superintendent of the city division.

"Yours, truly,                    Charles U. Gordon, Postmaster."

—That, calling upon the superintendent of the city division as directed, he was informed by him that he was assigned for duty to some position in the department in the main post office under the city delivery, stating nothing with respect to salary; and it is charged that there is no position in such main post office under the city delivery where the salary is as much as $2,000 per annum, the amount of salary connected with the position of superintendent at Station O. That no written charges of complaint have been made or filed with the head of the department. That he had no notice of any intention to remove him, and had no opportunity to make defense to any charges which may have been preferred against him; and he alleges the intention and design of the postmaster to be to remove him from his position as superintendent of Station O, and to reduce him in rank, without an opportunity to make defense. This action he alleges to be in violation of the civil service act, and rules promulgated by the president of the United States in pursuance thereof. The answer does not contest the facts charged, but asserts that the position of superintendent at Station O is not within the classified civil service of the United States in the sense that competitive examination is required to fill it, other than such examination as is required for entering the letter-carrier service of the postal department of the government. Upon the bill and answer an application is made to the court for its writ of injunction to restrain the removal of the complainant.

John T. McDonald and John W. Ela, for complainant.

John C. Black, U. S. Atty., for defendants.

JENKINS, Circuit Judge (after stating the facts as above). The importance of the question presented, and the far-reaching effect of the conclusion which may ultimately be reached with respect to it, require the careful statement of the provisions of law which hedge about and govern the civil service of the United States, so far as they may have bearing upon the particular question upon which the court is called to pass. In the consideration of the question the court is not at liberty to indulge in speculation concerning what ought to be. Its duty is limited to the determination of the law as it is. If the acts of congress are not sufficient to include such regulation of the public service as is desirable, the remedy must be applied by the legislative, and not by the judicial, department of the government.

As early as the year 1871, an effort was made to reform the civil service of the United States in order to promote its efficiency, and by act of March 3, 1871 (16 Stat. c. 114, § 9, incorporated in the revision as section 1753), the president was authorized to prescribe regulations for the admission of persons into the civil service, and to ascertain the fitness of each candidate in respect to age, health, character, knowledge, and ability for the branch of service into which he sought admission, and authority was given to employ suitable persons to conduct such inquiries, to prescribe their duties, and to establish regulations for the conduct of persons who may receive appointment in the civil service. The reform thus originated was followed in the year 1883 by an act entitled "An act to regulate and improve the civil service of the United States" (22 Stat. c. 27, p. 403), commonly called the "Civil Service Act." This act provides for the appointment by the president, by and with the advice and consent of the senate, of three persons as civil service commissioners, to constitute a United States civil service commission. It was made the duty of these commissioners to aid the president, as he may request, in preparing suitable rules to carry the act into effect; and when such rules have been promulgated it became the duty of all officers of the United States in the departments and offices to which such rules should apply to aid in all proper ways in carrying the rules, and any modification of them, into effect. The act further provides that such rules should provide and declare, as nearly as the conditions of good administration would warrant, among other things, for open competitive examinations for testing the fitness of applicants for the public service then classified or thereafter to be classified under the act, and which should test the relative capacity and fitness of the persons examined to discharge the duties of the service into which they sought appointment; and all the offices, places, and employments arranged or to be arranged in classes should be filled by selections according to grade from among those rated highest as the results of such competitive examinations; that there should be a period of probation before any absolute appointment or employment; that no person in the public service should, for that reason, be under any obligation to contribute to any political fund, or to render any political service, and that he should not be removed or otherwise prejudiced for refusing to do so; that no one in the service has any right to use his official authority or influence to coerce the political action of any person or body; that notice should be given by the appointing power to the commission of the persons selected for appointment or employment from among those examined, of the rejection of any such person under probation, of transfers, resignations, and removals, and of the date thereof; the record of all which should be kept by the commission. The commission was authorized to employ a chief examiner, whose duty it should be to act with the examining boards to secure accuracy, uniformity, and justice in all their proceedings. The act makes full provision for the punishment of any one in the public service who should willfully and corruptly, by himself or in co-operation with any other, defeat, deceive, or obstruct any person with respect to the right of examination according to the rules and regulations to

be adopted, or who should willfully, corruptly, and falsely mark, grade, or estimate, or report upon the examination or proper standing of any one examined under the act, or who should willfully and corruptly make any false representations concerning the same, or who should willfully or corruptly furnish to any one any special or secret information for the purpose of either improving or hindering the prospects or chances of any one so examined or to be examined, being appointed, employed, or promoted. The act further provided, with respect to the department of the treasury and the postal service, that the secretaries of those departments should make classifications and report the same to the president. After the expiration of six months from the passage of the act, no officer or clerk should be appointed or should be employed to enter or be promoted in either of the classes then existing, or that might be arranged under the act pursuant to the rule, until he had passed an examination, or was shown to be specially exempted therefrom. By section 13 of the act it was provided that no officer or employé of the United States mentioned in the act shall discharge, or promote, or degrade, or in any manner change the official rank or position of any other officer or employé, or promise or threaten so to do, for giving, withholding, or neglecting to make any contribution in money or other valuable thing for any political purpose; and stringent provisions were made prohibiting any senator or representative or territorial delegate of the congress, or senator, representative, or delegate elect, or any officer or employé of either of said houses, or any executive, judicial, military, or naval officer of the United States, or any clerk or employé of any department, branch, or bureau of the executive, judicial, military, or naval service of the United States, to be in any manner concerned in soliciting or receiving any assessment, subscription, or contribution for any political purpose whatever from any officer, clerk, or employé of the United States, or any department, branch, or bureau thereof, or from any person receiving any salary or compensation from moneys derived from the treasury of the United States; and prohibiting any person to collect contributions of money or other things of value for political purposes in any room or building occupied in the discharge of official duties by any officer or employé of the United States mentioned in the act, or in any navy yard, port, or arsenal, and prohibiting any officer, clerk, or any other person in the service of the United States from directly or indirectly giving to any other officer, clerk, or person in the service of the United States, or to any senator, or member of the house of representatives, or territorial delegate, any money or valuable thing on account of, or to be applied to the promotion of, any political object whatever. A violation of these stringent provisions was made a misdemeanor punishable by fine not exceeding $5,000, or by imprisonment not exceeding three years, or by both such fine and imprisonment.

The purpose of this act and its limitations are manifest. Its object was to provide for the civil service, or for such branches of it as should be included within the provisions of the act, a thoroughly competent body of men, selected for competency and fitness for the positions sought. Any citizen who should, by the necessary examination,

approve himself qualified for the position, was made eligible to appointment to that position without respect to political faith or other considerations which had theretofore largely controlled in the appointment to place, and to protection in the position which he might thus secure against accountability to any political party. He was protected by the provisions quoted from solicitation, and it was provided that he should not be discharged, promoted, or degraded, or in any manner changed in official rank or compensation, for giving or withholding or neglecting to make any contribution of money or other valuable thing for any political purpose. There is, however, no provision in this act which denies to the appointing power the right of removal, discharge, promotion, or change in rank and compensation, as might have been done prior to the act, with the single exception noted,—prohibiting such removal or change for giving or failing to contribute to a political purpose, or for rendering or failure to render a political service. It has been supposed in some quarters that congress undertook by this civil service act to restrain the exercise of the power to remove by the appointing power, and it is said that, if this was not the intention of congress, then the act is mere brutum fulmen, and the attempt of congress to improve the civil service is futile and abortive. I do not so understand the act, nor do I consider the object of congress to be abortive from failure to so provide. If it was the design of the congress to absolutely prohibit the exercise of the power of removal, it was a simple matter to have so declared; and the fact that removal was forbidden for a particular cause is strong to show that it was not designed to be forbidden with respect to other causes. It is a cardinal canon in the construction of statutes, "Expressio unius est exclusio alterius." The congress saw fit to prohibit removal for the one cause stated. That is equivalent to an expression by the legislature that it was not deemed wise that removal should be prohibited for other causes. The evil sought to be remedied was explicitly stated. The act declares that no one in the public service is for that reason under obligation to contribute to political funds, or to render political service, and he should not be removed or otherwise prejudiced for refusal to do so. That protection was thrown about the incumbent in office, not as a right personal to himself, but for the general good of the service; not as conferring upon him the right to hold his position irrespective of other needs of the service, nor as giving him an unlimited claim to the position, but merely to purge the public service of that which had become scandalous,—the substantial compulsory assessment of public officers for political purposes. I perceive in this act, with respect to the limitation of the power of removal, no other purpose to be subserved, and no other thought expressed. Nor does it follow that such construction of the act renders abortive the provision with respect to examinations and limitation of the power of appointment and promotion to those who have passed the examination. It still remains true that the act procures a body of men for the public service whose appointment is made to depend upon fitness, and not upon political favor. That was the object sought to be accomplished. It is in no way disturbed because congress has failed to otherwise limit the power of removal, because, notwithstand-

ing the power to remove may exist, the filling of the vacancy so created must not be controlled by political considerations, but the appointment must be made from those who have passed examination. It is not within the province of the court to consider whether it would be wise to further restrict the power of removal. That is a matter purely within the legislative discretion, and with which the courts cannot concern themselves. We have only to declare the law as it was enacted, and to construe its meaning. It may be, however, observed that the history of the legislation in question justifies the conclusion that the omission further to restrict the power of removal was not without design. It was deemed sufficient to prevent undue political influence, and that appointment to office should be restricted to those who had passed examination, and had proved themselves qualified. It may be that congress considered that, in the administration of the business of the government through its many departments, something is due to the head of each department or office with respect to the personnel of his subordinates, irrespective of the question of qualification for the position,—something with respect to his conduct, to his behavior to his superior, even if the incumbent be thoroughly qualified in the mere discharge of the duty pertaining to the position; that the head of the office or department should have some measure of control over those for whom he is responsible. It may also be that the congress considered that with respect to most subordinate positions it is the better policy that the responsible superior should deal with the question of removal or change; that the public business might be blocked or seriously interrupted if the superior should be obliged to entertain and enter upon the formal trial of every charge which, in the intense struggle for place, might be brought against the incumbents of office. It was possibly for these reasons that congress omitted further restriction upon the power of removal. It is sufficient, however, to say that congress has not otherwise than as stated limited the power of removal or change of position in the public service. It may be pertinent to observe that the constitutional right of congress to restrict the power of the president to remove from office, which is an incident to the power of appointment, is not without doubt. An interesting historical review of the question may be found in Parsons v. U. S., 167 U. S. 324, 17 Sup. Ct. 880, in an elaborate opinion by Mr. Justice Peckham. In that case it was ruled that the president could lawfully remove a district attorney of the United States within the four years from the date of his appointment, notwithstanding the statute provided that "district attorneys shall be appointed for a term of four years and their commissions shall cease and expire at the expiration of four years from their respective dates"; the statute being construed to mean that the term should not last longer than four years, subject to the right of the president to sooner remove.

On the 2d day of November, 1896, the president of the United States made and promulgated certain rules, revoking all others, for the regulation of the civil service. This was stated by him to have been done "in the exercise of power vested in him by the constitution, and the authority given to him by the 1753d section of the Revised Statutes, and by an act to regulate and improve the civil service of the

United States, approved January 16, 1883." These rules provided for certain classifications and exemptions from such classifications, and regulated promotions in the service. It is not necessary to state those rules in detail. It is only needful to say that they do not regulate removals from office, except for political or religious opinions or affiliations, and that the bill in this case charges no such consideration for the action of the postmaster which is here in question. But on July 27, 1897, the president of the United States promulgated an order announced as an amendment to rule 11, as follows: "No removal shall be made from any position subject to competitive examination except for just cause, and upon written charges filed with the head of the department or other appointing officer, and of which the accused shall have full notice, and an opportunity to make defense." This is an authoritative expression by the executive of the United States of his desire and command to his subordinates with respect to removal from office of those coming within the scope of the civil service regulations. Possessed by the constitution of the power of appointment and removal, except, possibly, as he may be therein restricted by act of congress, the executive has the right to regulate for himself the manner of appointment and removal. He may direct his subordinates, who exercise under him, in certain cases, the power of appointment and removal, with respect thereto, and may regulate the manner in which they may act for him; but this is an administrative order of the executive, not made in compliance with any law, or in regulation of the execution of any law enacted by congress restricting his right of removal, but is simply an instruction to those who hold positions by virtue of his appointment of the manner in which they shall discharge their duties in respect to the removal of their subordinates. The order is not the law of the land; it is not the emanation of the lawmaking power, but is merely a regulation adopted by the executive, as he rightfully might, in regulation of the conduct of those who are subject to his authority. He made it, and may, at his pleasure, rescind it. The law of the land is not subject to repeal by the executive. The regulation and orders of the executive or heads of departments under authority granted by congress— such as the order under consideration here—are regulations prescribed by law in the sense that acts done under them are upheld; and in that light they may have the force of law. But the failure to do the act thereby enjoined, or the doing of the act thereby prohibited, does not render one liable to the law. U. S. v. Eaton, 144 U. S. 677, 688, 12 Sup. Ct. 764. Consequently, no vested right to hold office indefinitely is acquired by the incumbent by virtue of the executive regulation in question. This executive order or regulation therefore confers no right upon the incumbent of office of which a court of equity can take cognizance. He who disobeys such order of the president is responsible to, and must be dealt with by, him. Courts of equity are not constituted to regulate the departments of the government. Their jurisdiction is limited to the protection of the rights of property. They have no concern, as I understand the boundaries of their jurisdiction, over the appointment and removal of public officers. Possibly, in exceptional cases, where one having a

vested right in and possession of a public office is sought to be ejected therefrom unlawfully, and by force, equity may intervene by writ of injunction to protect such possession against the interference by a claimant to the office, remanding the latter to the legal remedies by which he may establish his title. High, Inj. § 1315. But to no greater extent has the equity jurisdiction gone, and it cannot rightfully be employed to interfere between superiors and subordinates with respect to an office in which one has no vested right. Thus, in Re Sawyer, 124 U. S. 200, 210, 8 Sup. Ct. 482, it is said:

"The office and jurisdiction of a court of equity, unless enlarged by express statute, are limited to the protection of rights of property. It has no jurisdiction over the prosecution, the punishment, or the pardon of crimes or misdemeanors, or over the appointment and removal of public officers. To assume such a jurisdiction, or to sustain a bill in equity to restrain or relieve against proceedings for the punishment of offenses, or for the removal of public officers, is to invade the domain of courts of common law, or of the executive and administrative department of the government."

And so, also, in World's Columbian Exposition v. U. S., 18 U. S. App. 42, 159, 6 C. C. A. 58, and 56 Fed. 654, the court of appeals of this circuit, speaking through Mr. Chief Justice Fuller, declared:

"The office and jurisdiction of a court of equity, unless enlarged by express statute, are limited to the protection of rights of property. The court is conversant only with questions of property, and the maintenance of civil rights, and exercises no jurisdiction in matters merely political, illegal, criminal, or immoral."

At the argument the court was referred to a decision by Judge Jackson in the United States circuit court for the district of West Virginia, in the case of Priddie v. Thompson (rendered July 28, 1897, as yet officially unreported) 82 Fed. 186, in which case it was held that, without respect to the order of the president of July 27, 1897, the power of removal from office, except for cause, did not, under the civil service act, now exist, and that a court sitting in equity would restrain such attempted removal. With deference, I cannot concur in the conclusion of that learned judge. I find no language in the act hinting at or suggesting any such intention on the part of the congress of the United States. I think, as I have above explained, that under any proper construction of the act the intention to leave the power of removal where it previously existed, except in the one case specified, is clear and undoubted; and the case In re Sawyer, supra, which is quoted by Judge Jackson to explain the power of a court of equity to enjoin removal from office, is directly opposed, as I think, to the conclusion of the court in Priddie v. Thompson.

Since the foregoing was penned, I am advised by the public press of the decision of Judge Cox, of the supreme court of the District of Columbia, rendered September 14, 1897, in the case of Wood v. Gary, Postmaster General, in which that court would seem to have reached the same conclusion to which I am constrained. I have no opportunity of examining the opinion of the court in that case. If reliance may be placed upon the press report of the decision, it would seem to proceed along the same lines of reasoning adopted in this opinion.

It follows that the rule for a writ of injunction must be discharged, and the temporary restraining order dissolved.