WORLD'S COLUMBIAN EXPOSITION CO. v. REPUBLIC OF FRANCE.

(Circuit Court of Appeals, Seventh Circuit.   October 3, 1899.)

No. 488.

1. REHEARING—PRACTICE IN CONSIDERING PETITION.
   By the practice of the circuit court of appeals, only the judges who joined in rendering a decision are responsible for the granting or refusing of a petition for rehearing.

2. REVIEW ON APPEAL—ACTION TRIED TO COURT.
   On the trial of an action at law in a circuit court without a jury, by written stipulation, as in an action tried to a jury, either party may by motion present the question of his right to a judgment as a matter of law upon the whole evidence; and on appeal an adverse ruling on such a motion

may be reviewed, and the entire evidence, presented by bill of exceptions, may be considered by the circuit court of appeals for that purpose.

**8. Contracts—Exemption from Liability for Negligence.**

The provision contained in the regulations promulgated by the World's Columbian Exposition Company, and made known to all intending exhibitors, that the corporation would in no way be responsible for losses of any kind, however originating, was not against public policy, and was valid to exempt the company from liability for losses due to negligence, to the extent, at least, of any negligence not directly chargeable to the directors or managing officers of the company, and not of a distinctly gross, wanton, or willful character; and such regulation formed an essential part of every contract between the company and an exhibitor arising from the placing of goods on exhibition.

In Error to the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

Edwin Walker, for plaintiff in error.
William Burry, for defendant in error.

Before BROWN, Circuit Justice, and WOODS and JENKINS, Circuit Judges.

WOODS, Circuit Judge. By the practice of this court, only the judges who joined in rendering a decision are responsible for the granting or refusing of a petition for a rehearing. While therefore technically true, it is not a ground of just criticism, "that in cases like the present, under the act of congress establishing the court (31 C. C. v., 90 Fed. v.) and under rule 27 (31 C. C. A. cxviii., 90 Fed. cxviii.), a petition for a rehearing may be granted when a majority of the court were not present at the original hearing, and could not be familiar with the oral argument submitted at such hearing." In this instance the petition for a rehearing was filed after the death of Judge Showalter, who prepared the opinion of the court as reported (33 C. C. A. 333, 91 Fed. 64), and the rehearing was ordered upon the recommendation of the other judges who were present at the hearing and concurred in the decision. Upon consideration of the petition, they were not willing, and the court now, after reargument, is not content, to abide by the holding that the declaration is so defective as to be incurable by verdict; and the question recurs whether the case, as presented, is reviewable.

By written stipulation a trial by jury was waived. No exception was saved to the admission or exclusion of evidence, nor to any ruling of the court during the progress of the trial; but at the end of the trial the plaintiff in error excepted to, and has assigned error upon, the refusal of the court to find the following proposition, submitted in connection with special findings of fact which the court was asked, but refused, to adopt:

"The court holds, as a conclusion of law, that the plaintiff's exhibits remained in the Manufactures Building on and after January 1, 1894, solely and exclusively for the convenience and benefit of the plaintiff, without benefit either direct or indirect to the defendant; that whatever care the defendant assumed to exercise over said exhibits was entirely and wholly gratuitous; and that the defendant cannot be held liable for the damages charged, except gross negligence on the part of the defendant be proven, and, there being no

evidence in the record showing or tending to show gross negligence upon the part of the defendant, the plaintiff cannot recover."

This, it is objected, is a mixed proposition of law and fact; but we are of opinion that the matters of fact referred to are either undisputed or immaterial, and that in legal effect the proposition is an assertion that the entire evidence is not sufficient to justify a finding for the plaintiff. The bill of exceptions purports to contain all the evidence offered by either party, and whether it is sufficient to sustain the finding is a question of law. It is true that, generally speaking, it may be more a question of fact than of law whether proven negligence is of one degree or another; but, on the facts of this case, we deem it determinable as a matter of law whether there was a right of recovery, and will treat the proposition submitted to the court, though not expressed with entire accuracy, as sufficient to present that question. This court, by clause 4 of its rule 24 (31 C. C. A. cxvii., 90 Fed. cxvii.), "at its option may notice a plain error involving the merits of the case, though not assigned or specified, and though the question be not saved according to the strict rules of practice, if it be apparent of record that the point was contested and not waived in the court below." It has often been declared that in cases at common law, tried without a jury, "a bill of exceptions cannot be used to bring up the whole testimony for review, any more than in a trial by jury" (Norris v. Jackson, 9 Wall. 125); but, properly understood, the rule applies only when the evidence is conflicting, or when the inferences deducible therefrom are doubtful. In trials by jury it is competent for a party to move for a peremptory instruction on the ground of an essential lack of evidence to justify an adverse verdict, and in a trial by the court without a jury there is the same right to challenge the sufficiency of the evidence to warrant an adverse finding. "If the finding," said the supreme court in Martinton v. Fairbanks, 112 U. S. 670, 672, 5 Sup. Ct. 322, "depends upon the weighing of conflicting evidence, it was a decision on the facts, the revision of which is forbidden to this court by section 1011 [of the Revised Statutes]. If the question was whether all the evidence was sufficient in law to warrant a finding for the plaintiff, he [the defendant] should have presented that question by a request for a definite ruling upon that point." See, also, Insurance Co. v. Folsom, 18 Wall. 237, and St. Louis v. Western Union Tel. Co., 148 U. S. 92, 13 Sup. Ct. 485.

The facts in this case are numerous, but in no essential respect uncertain. The plaintiff in error was incorporated on April 9, 1890, under the statute of Illinois entitled "An act concerning corporations," and the acts amendatory thereof, for the object of the "holding of an international exposition or world's fair in the city of Chicago and state of Illinois to commemorate on its 400th anniversary the discovery of America." Its capital stock, at first $5,000,000, afterwards was increased to $10,000,000. The name first adopted was later changed to "World's Columbian Exposition." It will be called, for convenience, the "Exposition Company."

The chief provisions of the act of congress of April 25, 1890, under which the exposition was instituted and held, are set out in the

96 F.—44

statement of the case of World's Columbian Exposition v. U. S., 18 U. S. App. 42, 6 C. C. A. 58, 56 Fed. 654, in which the respective relations of the United States and the local corporation to the enterprise were considered, in so far as involved the question whether the exposition should be open on Sundays. The title and sections 2, 5, 6, and 10 of the act (26 Stat. c. 156) read as follows:

"An act to provide for celebrating the four hundredth anniversary of the discovery of America by Christopher Columbus, by holding an international exposition of arts, industries, manufactures, and the products of the soil, mine and sea, in the city of Chicago, in the state of Illinois."

"Sec. 2. That a commission, to consist of two commissioners from each state and territory of the United States and from the District of Columbia, and eight commissioners-at-large, is hereby constituted to be designated as the World's Columbian Commission."

"Sec. 5. That said commission be empowered in its discretion to accept for the purposes of the World's Columbian Exposition such site as may be selected and offered, and such plans and specifications of buildings to be erected for such purpose, at the expense of and tendered by the corporation organized under the laws of the state of Illinois, known as 'The World's Exposition of Eighteen Hundred and Ninety-Two': provided, that said site so tendered, and the buildings proposed to be erected thereon, shall be deemed by said commission adequate to the purposes of said Exposition; and provided, that said commission shall be satisfied that the said corporation has an actual bona fide and valid subscription to its capital stock, which will secure the payment of at least five millions of dollars, of which not less than five hundred thousand dollars shall have been paid in, and that the further sum of five million dollars, making in all ten million dollars, will be provided by said corporation in ample time for its needful use, during the prosecution of the work for the complete preparation for said Exposition.

"Sec. 6. That the said commission shall allot space for exhibitors, prepare a classification of exhibits, determine the plan and scope of the Exposition, and shall appoint all judges and examiners for the Exposition, award all premiums, if any, and generally have charge of all intercourse with the exhibitors and the representatives of foreign nations. * * *"

"Sec. 10. That whenever the president of the United States shall be notified by the commission that provision has been made for grounds and buildings for the uses herein provided for, and there has also been filed with him by the said corporation, known as 'The World's Exposition of Eighteen Hundred and Ninety-Two,' satisfactory proof that a sum not less than ten million dollars, to be used and expended for the purposes of the Exposition herein authorized, has in fact been raised or provided for by subscription or other legally binding means, he shall be authorized, through the department of state, to make proclamation of the same, setting forth the time at which the Exposition will open and close, and the place at which it will be held; and he shall communicate to the diplomatic representatives of foreign nations copies of the same, together with such regulations as may be adopted by the commission, for publication in their respective countries, and he shall, in behalf of the government and people, invite foreign nations to take part in the said Exposition and appoint representatives thereto."

The proclamation of the president, issued on December 24, 1890, contained the following:

"Whereas, satisfactory proof has been presented to me that provision has been made for adequate grounds and buildings for the uses of the World's Columbian Exposition, and that a sum not less than $10,000,000, to be used and expended for the purposes of said Exposition, has been provided in accordance with the conditions and requirements of section 10 of an act entitled 'An act to provide for celebrating the four hundredth anniversary of the discovery of America by Christopher Columbus, by holding an international exhibition of arts, industries, manufactures and the product of the soil, mine and sea, in the city of Chicago, in the state of Illinois.' Approved April 25, 1890. Now,

therefore, I, Benjamin Harrison, president of the United States, by virtue of the authority vested in me by said act do hereby declare and proclaim that such international exhibition will be opened on the first day of May, in the year eighteen hundred and ninety-three, in the city of Chicago, in the state of Illinois, and will not be closed before the last Thursday in October of the same year. And, in the name of the government and of the people of the United States, I do hereby invite all the nations of the earth to take part in the commemoration of an event that is pre-eminent in human history and of lasting interest to mankind, by appointing representatives thereto, and sending such exhibits to the World's Columbian Exposition as will most fitly and fully illustrate their resources, their industries, and their progress in civilization. In testimony whereof," etc.

This invitation was communicated in the regular way to the French government early in the ensuing February, and by letter of March 5, 1891, the secretary of state announced to the director general of the Exposition Company "the formal acceptance by the government of France of the president's invitation to participate in the Chicago Exposition of 1893."

On November 5, 1891, the secretary of the treasury issued regulations relative to free importation of articles for exhibition, embracing the following rules:

"Rule 10. Articles sent by foreign governments to the Exposition, which are used solely for government purposes and are not intended for sale, will be admitted to entry at the exterior port of arrival on certificates of the proper foreign commissioner, without the production of invoice. But it is desired that the estimated value of each package shall be stated on the certificate or bill of lading, in order that the pecuniary responsibility of the transportation company may be fixed."

"Rule 12. The buildings and spaces set apart for the purposes of the Exposition are constituted 'constructive bonded warehouses and yards,' and all foreign articles placed therein under the supervision of the customs officers will be treated the same as merchandise in bond."

"Rule 16. The articles after having been received in the Exposition will remain under the custody of the customs officers, and must not be removed from the place assigned without a permit from the collector of customs or the officer who may be designated by him to grant such permit. In no case shall such articles be released from the custody of the customs officers unless the same shall have been regularly withdrawn for consumption, for warehouse, or for export."

General rules and regulations under date of January 23, 1893, signed, "George R. Davis, Director General," were published, of which numbers 7 and 20 were as follows:

"Rule 7. Reasonable precautions will be taken for the preservation of exhibits: but the World's Columbian Exposition will not be responsible for any damage to, or for the loss or destruction of, an exhibit, resulting from any cause."

"Rule 20. Immediately after the close of the Exposition, exhibitors must remove their effects, and complete such removal before January 1st, 1894. Goods then remaining will be removed and disposed of under the direction of the World's Columbian Exposition."

On June 21, 1893, the board of directors of the Exposition Company adopted the following resolution, which was never revoked:

"Resolved, that George R. Davis be recognized as director general by this corporation. subject. however, to the express right at any time of the board of directors or its executive committee to revoke such action."

An official circular was issued, under date of December, 1891, containing twenty-five "General Regulations for Foreign Exhibitors," of which the following are pertinent here:

"(5) Before November 1, 1892, the foreign commissions must furnish the director general with approximate plans showing the manner of allotting the space assigned to them, and also with lists of their exhibitors, and other information necessary for the preparation of the official catalogue."

"(9) If products are intended for competition, it must be so stated by the exhibitor. If not, they will be excluded from the examination by the international juries."

"(13) The World's Columbian Exposition will take precautions for the safe preservation of all objects in the exhibition, but it will in no way be responsible for damages or loss of any kind, or for accidents by fire, or otherwise, however originating.

"(14) Favorable facilities will be arranged by which exhibitors or foreign commissions may insure their own goods. Foreign commissions may employ watchmen of their own choice to guard their goods during the hours the Exposition is open to the public, subject to the rules and regulations of the Exposition.

"Note. A thoroughly equipped fire department will protect the buildings and exhibits, and a large police force will maintain order. The entire Exposition grounds will be under the immediate supervision of the city of Chicago and of the state of Illinois. A guard equal to any possible contingency is thus provided; the municipal authority being upheld, if necessary, by the state troops, and the state by the army of the United States, so that no apprehension need arise as to losses resulting from lawlessness."

"(23) Immediately after the close of the Exposition, exhibitors shall remove their effects, and complete such removal before January 1, 1894. Goods then remaining will be removed and sold for expenses, or otherwise disposed of under the direction of the World's Columbian Exposition."

"(25) All communications concerning the Exposition will be addressed to the Director General World's Columbian Exposition, Chicago, Illinois, U. S. A."

These regulations were submitted to all exhibitors at the time of the allotment of space, and were in force when the exhibits were installed. The director general made all allotments of space both to domestic and foreign exhibitors, and, desiring to get the representative nations in the center of Manufactures Building, assigned there "one hundred thousand feet to each of the nations, Great Britain, Germany, America, and France." The French consul, at or before the time of accepting the allotment, propounded to the director general written interrogatories, of which the fourth and ninth, and the answers thereto, were read in evidence, and are as follows:

"(4) On the other hand, the same section (13) says the Exposition will take precautions for the safe preservation of objects, but will in no way be responsible for damage or loss, or for accidents by fire or otherwise. What are the precautions spoken of going to be? Answer. Protection will consist of a thoroughly equipped fire department, and a large police force."

"(9) About any other losses to be incurred otherwise than by fire, under what jurisdiction and police regulation is the international exhibit going to be placed? Are the grounds and buildings going to be treated for public protection like U. S. warehouses, subject to the federal laws and courts, or under state and municipal laws of police? Answer. Foreign exhibits will be under the immediate charge of officers of the U. S. government. The entire Exposition grounds and buildings will be under the immediate jurisdiction of the municipality of the city of Chicago and the state of Illinois. A police force and guard, equal to any possible contingency, will be provided. Under our system of government, the authority of the municipality is upheld by the state, and the state by the general government, so that no apprehension need arise

as to losses resulting from acts of lawlessness; such an occurrence being, at most, a very remote possibility."

These are the facts in evidence on which must be determined what measure of diligence the plaintiff in error became bound from the beginning to exercise in order to protect exhibits from harm; and, before proceeding to the circumstances of the loss which occurred, it is well to consider that question. It is not contended that at the time of the loss greater diligence was obligatory than at any time before, and we do not find it necessary to inquire whether after January 1, 1894, a less degree of care than before that date was required. If the case turned upon that question, it would involve the inquiry to what extent the Exposition Company was responsible for the failure of the defendant in error to remove its exhibits before the injury was suffered, and, the evidence on the point being conflicting, the finding of the court could not be reviewed.

What obligation did the plaintiff in error incur to the French republic or to other exhibitors, or under what duty did it come, for a breach of which it may be held responsible? Distinct notice was given to all proposing to make exhibits, and especially to the French consul, that the Exposition Company would take precautions for the safe preservation of all objects in the exhibition, but would "in no way be responsible for damage or loss of any kind, or for accidents by fire, or otherwise, however originating." Yet, for reasons stated in its opinion (83 Fed. 109), the court below held it to be the law of the case "that the management of the Exposition was under legal obligations to safeguard by the highest intelligence and protection compatible with the ephemeral character of the buildings the exhibits of the plaintiff, the French republic and the French citizens, and that such obligation is not escaped by the exempting clauses contained in the regulations promulgated by the director general." The position asserted in the brief for the defendant in error is that the relation between the parties "was plainly that of bailee and bailor"; "that it was a bailment made by defendant in error with plaintiff in error at the request of, and for the sole use and benefit of, the latter, and so continued until the damage was done. It was the bailment known as a 'commodatum.'" The declaration, however, can hardly be deemed to present the case on that theory, though in each count there is an averment that the plaintiff's goods were put on exhibition at the request and for the profit and benefit of the defendant, "without recompense or reward to said plaintiff moving from said defendant or any other person." That is not equivalent to an allegation that the part taken by France in the Exposition was not intended for the benefit of the republic or of the French people. The French exhibits, like all from abroad, came into the Exposition with a pecuniary value attached to each article. Some of the articles were intended for sale, and some were sold before removal, and while others, including all that were injured, were there for exhibition only, yet with those for sale they constituted but one exhibit and one bailment, if bailment there was. The idea of calling the French exhibit a loan to the Exposition is hardly possible. Seven hundred thousand dollars of public money

was expended by the republic in making it, and, even if it could be called a loan to the Exposition, it would be difficult to believe that it was made solely for the benefit of the local corporation, and without thought for commercial advantage and for the glory of France. There was at most a bailment for the benefit of both parties, under which, but for the provision against liability, the bailee would have been responsible for a failure of ordinary care. If it were necessary to define more accurately the measure of responsibility, in the absence of a stipulation on the subject, the nearest analogies, perhaps, would be found in the decisions concerning agricultural societies. Like such societies, the World's Columbian Exposition owed a duty to the visiting public to render its grounds and buildings reasonably safe for all persons in lawful attendance; yet in Phillips v. Society, 60 Wis. 401, 19 N. W. 377, where a visitor was hurt while stepping over a revolving shaft in use by the society, it was held that the plaintiff could recover only for a failure to exercise ordinary care. See, also, Brown v. Society, 47 Me. 275; Dunn v. Society, 46 Ohio St. 93, 18 N. E. 496. The more general holding seems to be that such organizations are private corporations (2 Am. & Eng. Enc. Law, 19), but in some states, including Illinois, they are treated as public or quasi public bodies (Society v. Hunter, 110 Ill. 155). In this case it was said that the reorganization of the company as a joint-stock company did not render it a corporation for private gain or profit, or change its character from a public to a private institution. Yet in that instance it was true, as it is of every such society, and as this court in the World's Columbian Exposition Case, 18 U. S. App. 42, 164, 6 C. C. A. 74, 56 Fed. 670, declared of the Exposition Company, that it "was organized for pecuniary gain." To the end of obtaining the money to pay expenses, that was necessarily so; but that there was from the beginning no intention or expectation of making gains beyond, or even approximately equal to, the expenses of the Exposition, the well-known facts admit of no doubt. But whether, upon general principles, such societies owe the same duty to a member or an exhibitor as to a stranger, coming within their gates, to protect his person and property from harm, we need not determine. If the rule should be so established, and certainly if it becomes known that only the highest intelligence and care consistent with the situation will exempt from liability, men may be expected to be slow to devote their energies and money to such enterprises, unless, indeed, by express disavowal or stipulation the risks which are necessarily incident thereto can be escaped.

Is there good reason why the notice given by the Exposition Company to exhibitors, that it would "in no way be responsible for damages or loss of any kind, * * * however originating," should not be given full effect according to its terms? We perceive none. Reference has been made to the doctrine, which is familiar as applied to common carriers, that public policy forbids contracts for exemption from liability for negligence, and a passage has been cited from Cooley on Torts (page 687) to the effect that the reasons which forbid such contracts "apply universally, and should be held to defeat all contracts by which a party undertakes to put another at the

mercy of his own faulty conduct." It is not the province of a text writer, any more than of a court, to cover by a dictum the entire range of possibilities in the application of a doctrine. The expression quoted is faulty, in that it assumes that every contract for exemption from the consequences of negligence necessarily implies an effort or undertaking of the party "to put another at the mercy of his own faulty conduct." That is perhaps so when the stipulated exemption is in favor of a natural person, who is to perform the contract without the employment of an agent, but it is not so when the exemption is in favor of a corporation. which can act, or of a person who proposes to act, only by agents; and it is easy to suggest many possibilities of contracts against liability for the negligence of agents or servants under circumstances admitting of no conceivable consideration of public policy to the contrary. Indeed, there is no apparent reason for declaring invalid a provision in the articles of any partnership or private corporation to the effect that the partnership should not be liable to a member, or the corporation to a stockholder, for the negligence of any employé or agent, unless, perhaps, the agent be a vice principal, and whether there should be that exception is by no means clear. Many of the clubs existing in the larger cities of the country are conducted much in the manner of hotels. Are they liable, even without provision in the articles of incorporation to the contrary, to members for losses suffered while in attendance? There is certainly no reason in public policy against a provision in the by-laws or constitution of such a club against such liability. Indeed, what policy of the law is there against an agreement between the stockholders of a hotel company, or a Pullman or Wagner Palace-Car Company, that there shall be no corporate liability to a stockholder for any loss or injury suffered by reason of the negligence of an employé or servant of the company? Whatever may be determined to be the proper answer to any of these suggestions, we have no doubt of the validity of the exempting clause here in question, to the extent, at least, of any negligence not chargeable directly to the board of directors or managing officers of the Exposition Company, and not of a distinctly gross or wanton or willful character. Since such negligence is not charged in any count of the declaration, this review might stop at this point, without inquiry into the evidence, or into the character or degree of negligence which the evidence tends to show. It being undeniable that the plaintiff in error gave notice to defendant in error that it would in no event be liable for any damage or loss, however caused, the relation between the parties is essentially different from that declared upon; and the variance is so radical, perhaps, as to make recovery, on the declaration as it is, impossible. "In framing a declaration in an action on the case," as was said in our first opinion herein, "the state of facts upon which the legal obligation or duty alleged to have been violated arose must be shown." The exempting clause being a fact in the case, no statement of the relation in which the parties stood to each other can be adequate which does not include that fact. So, too, of the contention advanced at the last hearing, that it was only necessary for the plaintiff to aver the delivery of the

goods, and a failure of the bailee to return them in good condition, the burden of showing an excuse being on the defendant; but, in order to have put the case in that posture, it was necessary to have alleged facts showing a bailment of that character, and in an attempt to do so, on a full statement of the facts disclosed in evidence, the pleader must have encountered a serious, if not insuperable, obstacle, both in the notice given, that the Exposition Company would not be responsible for any loss, and in the custom-house regulations, which put it out of the power of the management, without prior action of custom-house officers, to return, or to change the place of deposit of, foreign exhibits.

The fact has not been overlooked that the reservation against liability for loss or damage was preceded by the statement that the Exposition Company would "take precautions for the safe preservation of all objects in the exhibition," and that in the appended note it was said, "A thoroughly equipped fire department will protect the buildings and exhibits, and a large police force will maintain order," etc. When the entire note is taken into consideration, in connection with the very explicit provision against liability for any loss or damage, however caused, it is evident that there was no intention to express a contract obligation on the part of the company to establish and have ready upon every emergency a well-equipped fire department, police force, etc. The purpose was simply to announce the intention of the management, with the aid of the city authorities, and those of the state and of the United States, if necessary, to do the things stated; but for the performance of that intention they pledged only their good faith, stimulated necessarily by high motives and a desire for the success of the enterprise, but unaffected by pecuniary responsibility for failure.

This brings us to a consideration of the evidence, without reference to the pleadings: "The several acts of negligence, which in themselves," according to the brief for the defendant in error, are supposed to "constitute such affirmative negligence as renders plaintiff in error liable," are summarized in the brief as follows:

"First, the removal or dismantling of the high-pressure engines or apparatus, thereby disabling the fire department and rendering the standpipe useless; second, the diminution in the number of guards, by which irresponsible and evil-disposed persons could not be properly watched and guarded against; third, the free admission of any and all persons to the grounds before the removal of the exhibits; fourth, the diminution in the number of fire engines, leaving an entirely inadequate protection against fire; fifth, the failure to furnish promptly and seasonably the cases in which the goods were to be packed for removal, and which were in the custody of the defendant; sixth, the failure to provide cars for the removal of plaintiff's exhibits in due time after the close of the Exposition; seventh, the failure to promptly protect plaintiff's exhibits after the fire had started, or to remove them to a place of safety; eighth, the refusal to permit plaintiff's agents and employés, after the fire had started, to protect its exhibits or remove them to a place of safety."

Chief stress has been placed upon the first and fourth propositions, and they will be considered last.

The number of guards was greatly reduced after the close of the Exposition, but there is no ground for saying that the number retained was less than was supposed to be necessary, and it does not

appear that the loss suffered was attributable to the reduction. Guards were kept in all the buildings, but that "tramps and vagrants nested within their walls" we find no evidence in the record, except that after the 1st of January, 1894, when the gates of the park could no longer be kept closed, such characters came in large numbers upon the grounds. The fire originated in the Casino, where five guards were stationed, and, while the origin of the fire is not explained, there is no evidence that it was caused by tramps; and, if it were, further proof would be necessary to impose liability upon the plaintiff in error. The free admission of any and all persons to the grounds before the removal of the exhibits it was not in the power or duty of the management to forbid or control. If there was a failure to furnish the cases in which the goods were to be packed, or to provide cars for their removal, the failure was not a proximate cause of the fire nor of the consequent loss. If there was a failure promptly to protect the plaintiff's exhibits after the fire had started, or to remove them, or a refusal to permit the plaintiff's agents and employés to protect or to remove them to a place of safety, the responsibility was with the fire department and the guards or other subordinate employés, whose conduct at the time the management could not, and prudently would not, have attempted to control. The evidence shows that the guards and police were busy in guarding the doors of the Manufactures Building against crowds pushing for entrance, and that, with the others, two or three agents of the plaintiff were for a time denied admission. That the removal of goods out of danger was not authoritatively forbidden is demonstrated by the fact that the most valuable part of the exhibit was removed; and the uncontradicted testimony of Mr. Higginbotham, the president of the Exposition Company, is that he arrived upon the ground shortly before nine o'clock, and a few minutes later entered the Manufactures Building, where he remained until the fire was under control, and that "he observed no attempt on the part of those in control of the exhibits to remove them," and that nothing was said to him about removal. Even if removal was possible and was prevented, it was the result of the confusion and stress of the situation, and in no reasonable view could it be deemed to supply the ground for an action for damages. All these matters, whatever otherwise might be their merits, are within the fair scope of the exemption from liability, of which all exhibitors had timely notice, and, besides, were warned to provide against the obviously very great risks of the situation by employing watchmen of their own choice and by insuring their goods.

The same considerations are conclusive against liability for "the dismantling of the high-pressure engine or apparatus," and "the diminution in the number of fire engines." The high-pressure engine belonged to exhibitors, who dismantled it for the purpose of removal, as they had a right to do; and the only possible duty of the management was to replace it with an adequate substitute, if one was needed to keep the standpipe ready for an emergency. Such a substitute was not needed. The proof shows that it became necessary in December to let the water out of the pipe in order to prevent

freezing, but that it was practicable at any time to return the water therein to the requisite level "under such pressure as could have been imparted by a fire engine"; and, according to the opinion of the court below, if that had been done "the presence of two or three guards on the roof, distributing the water over the walks, would have prevented the ignition, and thus totally prevented the injury to the French exhibits." It was not until near four hours after the fire began, and twenty-five or more fire engines had been brought upon the ground, that the board walk on the roof of the Manufactures Building began to be in obvious danger; and there was therefore ample time to have attached to the standpipe an engine,—the floating engine was perhaps the most available,—and to have been ready for the emergency when it came. At a later hour, when the walk had ignited, but when there was yet time to extinguish the flame before it reached the French exhibits, the fire chief or marshal was urged by an employé of the defendant to connect an engine with the standpipe; but no attempt in that direction was made, and the blame manifestly is with the fire department, and not with the management of the Exposition. Again, there was in the Manufactures Building a supply of fire extinguishers, with which, but for the cold, the effect of which on extinguishers does not appear to have been understood, incipient fires in the walk might have been extinguished. The fire was finally extinguished, after doing the damage complained of, by carrying up long lines of hose,—a fact which demonstrates that the water could have been forced up the standpipe by the pressure of a fire engine,—and, if hose had been carried up immediately upon the change of wind which brought danger to the Manufactures Building, the burning of the walk and of the exhibits below would have been prevented. There are other pertinent circumstances, but it is enough to state our conclusion that, if there was fault of the Exposition Company in respect to the arrangements for forcing water through the standpipe, it was by no means of such a character as not to be covered by the stipulation for exemption from liability. The plaintiff in error never had upon the grounds more than eight fire engines of its own,—a number manifestly inadequate to meet probable emergencies. The reliance always and necessarily was upon aid from the fire department of Chicago, and that aid in this instance was furnished with notable promptness. It is not shown nor is it probable that, if the number of engines kept on the grounds had remained undiminished, the number brought promptly or finally into action would have been greater or more efficient. Whatever fault there was in the management of the engines, in respect to the Manufactures Building, occurred after they were on the ground, and for that fault the Exposition Company was not, and could not have been, responsible, since its engines, whether few or many, were, when in action, like those of the city, under the control of the fire marshal of the city. The guards, too, acted under the direction of the police.

It is important to observe that in respect to all the matters complained of which had a direct relation to the safety of the exhibits, the reduction in the number of guards and fire engines, and the

dismantling of the engines and pumps connected with the stand-pipe, no agent of the defendant in error, and no exhibitor or other person, made complaint of what was done, or suggested that other precautions against fire or other danger was necessary.

The judgment below is reversed, and the cause remanded, with direction to grant a new trial.